121 Mich. App. 659 (1982)
329 N.W.2d 446
In re BLUESTONE ESTATE
BLUESTONE
v.
GENERAL ELECTRIC CREDIT CORPORATION OF TENNESSEE
Docket No. 56487.
Michigan Court of Appeals.
Decided December 6, 1982.
Mason, Steinhardt & Jacobs, P.C. (by John E. Jacobs), and Mark B. Lopatin, for appellant.
Pevos & Pevos (by Daniel N. Pevos), for General Electric Credit Corporation of Tennessee.
Joel Simmer, for Canfield Finance & Discount Company, Waterford Medical Associates, P.C., Sanford and Beverly Wiatrak and Jack L. Laurie.
Scholl, Robinson & Stieg (by Loren T. Robinson, Jr.), for J. Max Robertson.
Before: V.J. BRENNAN, P.J., and D.C. RILEY and V.R. PAYANT,[*] JJ.
V.R. PAYANT, J.
Appellant estate appeals as of right from the probate court's order directing it to pay six claims arising from the decedent's personal guarantees of the obligations of his recently bankrupt *662 Southfield restaurant, Bagel Nosh of Michigan.
During the spring of 1977, decedent and other officers of Bagel Nosh arranged various loans and equipment leases for the purpose of opening the local restaurant. In return, the officers, including the decedent, agreed personally to guarantee certain of Bagel Nosh's obligations. Soon after the restaurant opened in July, 1977, it had become delinquent in its obligations. All of the officers who personally guaranteed Bagel Nosh's obligations, including decedent, resigned their positions. The operations of the struggling business were then left to Mark Lopatin, a son of two of the guarantors, Lawrence and Florence Lopatin. Mark Lopatin later served as "special counsel" for the appellant in the probate proceedings.
Appellant alleges that during 1978 Harvey Aidem, acting on behalf of Bagel Nosh's various creditors and lessors, arranged with Mark Lopatin to restructure the transactions to reduce or cure the restaurant's delinquencies. Oral agreements were allegedly reached between Aidem and Mark Lopatin. Several of these refinancing agreements were allegedly reduced to writing. Bagel Nosh's creditors and lessors, however, deny having agreed to any refinancing arrangement. Although the parties dispute the extent to which there may have been refinancing agreements, the parties agree that none of the guarantors were notified of any refinancing arrangements. Accordingly, none of the guarantors either consented or objected to any of the terms of any such agreement. Bagel Nosh continued to fall behind in its obligations and ceased making payments on those obligations in early 1979. It filed for voluntary bankruptcy in late 1979 and was adjudged bankrupt by a federal court in February, 1980.
*663 Decedent died in 1978, several months after the alleged refinancing agreements had been entered into. Proceedings in his estate commenced with the probate of his will during October, 1978. Three of the six claimants herein, Canfield Finance and Discount Company, Waterford Medical Associates, P.C., and General Electric Credit Corporation (GECC), filed timely contingent claims before the deadline for filing nontardy claims, January 9, 1979. The remaining claimants involved in this appeal, Jack Laurie, Sanford and Beverly Wiatrak, and J. Max Robertson, subsequently requested permission to file tardy claims. Two of the original nontardy claimants, Canfield and GECC, then filed petitions to make their contingent claims absolute. In April, 1979, the court appointed a referee to hear all contested claims. A hearing was held on February 13, 1980, as to several of the claims, but the referee did not issue any opinion or recommendation.
On May 13, 1980, the probate court heard argument pursuant to GECC's petition to make the balance of its original claim absolute. GECC had loaned Bagel Nosh $90,000 to purchase certain equipment and was granted a purchase money security interest in the equipment. When Bagel Nosh defaulted on the loan, GECC served written notice of its intention to sell the collateral at a private sale on all the guarantors but one, Lawrence Lopatin. The notice to Mr. Lopatin was returned twice by the post office to GECC as "unclaimed". Nevertheless, the collateral was sold for $25,000, a price in excess of its appraised value. At the hearing, Mark Lopatin, counsel for the estate, argued that GECC had not met its statutory obligation under the Uniform Commercial Code to notify all guarantors of the sale, *664 thereby barring GECC from collecting the $40,716.79 deficiency on Bagel Nosh's account. A second hearing was held on July 9, 1980, concerning GECC's petition. Following this hearing, the court took the matter under advisement.
The estate then filed a motion on June 11, 1980, requesting permission to file objections to the presentment of the three tardy claims. The probate court granted the motion and at a pretrial hearing directed the parties to submit briefs as to ten "Issues of Litigation"[1] agreed upon by the parties.
On December 24, 1980, without having held any further hearings, the probate court issued its opinion and order, granting all six of the claims in full. In its opinion, the court found that the language of the decedent's guarantees was unambiguous and that the estate was not allowed to introduce parol evidence of an unfulfilled condition precedent to the enforceability of those guarantees. The court further found that any modifications granted by Robertson, Laurie, and the Wiatraks did not release *665 the guarantors from liability since the guarantees in question expressly permitted modifications without notice to the guarantors. The court specifically found with respect to GECC's claim that the guarantors were "debtors", entitled under the Uniform Commercial Code to receive notice of an intention to sell collateral. However, the court held that GECC had taken reasonable steps to notify all guarantors of its intention to sell the collateral and that GECC had therefore complied with the statute.
On appeal, appellant raises several procedural and substantive objections to the probate court's opinion and order. Appellant first claims that the probate court erred in not admitting parol evidence as to the existence of an unfulfilled condition precedent to the enforceability of decedent's guarantees. According to appellant, decedent's guarantee was conditional upon the signing of all of Bagel Nosh's stockholders and their spouses. Because the guarantees in question lacked the signatures of two stockholders and their spouses, appellant contends, they were unenforceable.
Where a contract is clear and unambiguous and the parties intend the writing to be a complete expression of their agreement as to the terms covered therein, the parol evidence rule bars admission of prior or contemporaneous agreements which contradict or vary the written contract. Goodwin, Inc v Orson E Coe Pontiac, Inc, 392 Mich 195, 204; 220 NW2d 664 (1974).
Appellant urges that none of the guarantee documents were intended by the parties to serve as the full integration of their agreement. Appellant relies on NAG Enterprises, Inc v All State Industries, Inc, 407 Mich 407; 285 NW2d 770 (1979), and Michigan Bank, National Ass'n v William *666 J Kahlich, Inc, 23 Mich App 483; 179 NW2d 29 (1970), in support of its position. In both those cases, the granting of summary judgment was found to be improper where the party seeking to introduce parol evidence filed a counterclaim, alleging the existence of certain facts, which, if true, would have supported an inference that the guarantee in question did not constitute the complete agreement of the parties.
The instant case is distinguishable in that appellant has made no showing of any extrinsic circumstances which would suggest that the guarantee documents were anything other than the complete integration of the parties' respective agreements. Moreover, the probate court did not summarily dismiss or refuse to hear appellant's arguments on this issue. The court gave appellant ample opportunity to subpoena witnesses to testify or otherwise submit evidence to establish a condition precedent to the guarantees. Nonetheless, appellant failed to present any evidence to indicate that there was a condition precedent, or even assuming that one did exist, that it was unfulfilled.
Each guarantee document was specifically denominated as "unconditional" and contained no language which would imply that there was any condition precedent requiring all proposed guarantors to sign the documents before any guarantees would take effect. On the contrary, the documents provided that the guarantees were "several" as well as "joint" which suggests that each guarantor was assuming full liability without reference to the status of the other proposed guarantors. Furthermore, the agreements appear complete on their face, since all of the proposed guarantors' signatures appear in the spaces provided for them on each document. This is not a case where a third *667 person is named in the body of the agreement but does not sign. Cf. Palman v Reynolds, 310 Mich 35; 16 NW2d 657 (1944).
Based on the foregoing, we find the guarantee documents to be unambiguous and fully integrated agreements. The probate court therefore did not err in barring admission of parol evidence.
Appellant next argues that the refinancing agreements were material modifications of the guarantees, to which decedent did not consent, and therefore operated to release his estate from liability. We disagree.
All of the guarantee agreements, except the Canfield guarantee, specifically authorized the various claimants to grant modifications of the obligations without requiring notice to or consent of the guarantors.[2] It is a well-established rule that "[a] variation of the principal's contract which under the terms of the original agreement should have been anticipated as a possibility will not discharge the surety." 10 Williston on Contracts (3d ed), § 1242, p 774. The fact that the guarantors expressly waived notice of future modifications demonstrates *668 that they "anticipated" the possibility of such modifications. Hence, any refinancing agreements which modified Bagel Nosh's obligations did not operate to discharge the guarantors, even if the modifications were material.
The question remains, as to the Canfield guarantee which does not contain any comparable language waiving notice of future modifications, whether the refinancing agreements operated to the detriment of the guarantors, thereby justifying their release. The alleged refinancing agreements extended the term of the obligation and reduced the installment payments. Appellant urges that this agreement imposed a detriment on the guarantors because it extended the period of time for which they might be liable for the obligation and the reduced installment payments created a higher balance due for which the guarantors might ultimately be liable.
Although the probate court did not address this issue with respect to the Canfield guarantee, it did note that the extensions granted by Robertson, Laurie, and the Wiatraks did not substantially modify the liability of the guarantors so as to require that they be released, citing Krekel v Thomasma, 255 Mich 283; 238 NW 255 (1931), in support. We agree with the probate court's reasoning and find the following language in Krekel to be dispositive:
"As we understand the defendant's contention, it is that, as he is a gratuitous guarantor, any material departure from the strict letter of the guaranty operates to release him from liability. It seems to be conceded that the only effect of the transaction between Mr. Krekel and the bank was to extend the time for the payment of the Quality Furniture Company note. In this there was no departure from the terms of the *669 guaranty. The guaranty was a continuing one. It contemplated the giving of renewals and extensions. The fact that the extension was secured by Mr. Krekel did not alter the relations or the parties in the least. He was a joint obligor with the defendant. The giving of his personal note did not add to his liability or to that of the defendant. There was no change in their obligations under the guaranty. The defendant was not discharged." 255 Mich 286-287.
Moreover, we find appellant's reliance on Locke v McVean, 33 Mich 473 (1876), to be misplaced. In that case, the two principals, without notice to the guarantor, extended the time of payment as well as increased the amount of interest payable on the original obligation. The Court held that this alteration of the principal debt was material, thereby discharging the guarantor.
Here, by contrast, the alleged refinancing agreements were intended to ease Bagel Nosh's obligation by extending the time for payment without imposing any additional interest. The refinancing agreements did not operate to the guarantors' detriment, but rather to their benefit. We, therefore, find that the refinancing agreements do not operate to discharge the guarantors' liability.[3]
Appellant further claims that the probate court erred in not holding an evidentiary hearing or trial on the issue of whether GECC disposed of its collateral in a commercially reasonable manner. Appellant argues that GECC failed to meet the notice requirement on two grounds: (1) GECC had not sent any notice to two minor stockholders of *670 Bagel Nosh, who were not guarantors of Bagel Nosh's obligation to GECC; and (2) the letter containing the notice to one of the guarantors, Lawrence Lopatin, had been returned twice by the post office as "unclaimed".
MCL 440.9504(3); MSA 19.9504(3) requires a secured party to notify its debtor of an intention to sell its collateral at a private sale. We agree with the probate court's holding that a guarantor is a "debtor" and therefore entitled to notice of sale. However, we reject appellant's contention that nonguarantors of an obligation, such as stockholders of a debtor company, are entitled to notice of intention to sell collateral. Since the stockholders could not be held liable for the debt, they had little or no interest in the collateral and were therefore not entitled to the same statutory notice as were guarantors of the obligation.
The probate court properly found that GECC's efforts to notify all interested parties were commercially reasonable. This Court will not reverse findings of fact by a probate judge sitting without a jury unless the evidence clearly preponderates in the opposite direction. In re Howarth Estate, 108 Mich App 8, 10; 310 NW2d 255 (1981).
We disagree with appellant that an evidentiary hearing or trial was necessary to determine whether GECC satisfied the statutory notice requirements as to all guarantors of the obligation. The probate court held two hearings which dealt almost exclusively with this issue. Despite these opportunities, appellant never submitted any evidence which established that GECC acted unreasonably in its attempts to notify all interested parties nor that it had suffered any damages as a result of the manner of the sale. The record clearly revealed that GECC attempted not once, *671 but twice, to send the guarantor, Lawrence Lopatin, notice of the sale. It was undisputed that this guarantor was present in the bankruptcy court when the court gave GECC permission to take possession of the collateral and that, long before the sale, he was aware of the amount which the ultimate buyer had offered for it. Moreover, the close relationship between this guarantor and special counsel for the estate leads us to suspect the circumstances surrounding the former's nonnotification.
We also reject appellant's contention that the probate court's granting of all six claims in full without conducting a prior evidentiary hearing or trial constituted reversible error. The contested issues which appellant claims should have been subject to an evidentiary hearing are the same "issues of litigation" which were fully briefed and argued before the probate court at the June 11, 1980, pretrial hearing. Because the probate court properly decided each of these issues as a matter of law, there was no need for any evidentiary hearing.
Affirmed.
NOTES
[*] Circuit judge, sitting on the court of Appeals by assignment.
[1] The ten issues were as follows:

"1. Whether or not a tardy claim may be filed by claimants.
"2. Whether or not there is a time limit in which a contingent claim must be objected to after the date of filing the same.
"3. Is it necessary to file an objection to a tardy claim within a specified period of time.
"4. Is there a time limit to investigate a basis of a contingent claim.
"5. Does modification of a promissory note as to the time and method of payment modify or change the liability of the guarantors.
"6. Whether or not the guarantor of a corporate note can raise defenses of usury if the corporation cannot raise such a defense.
"7. Was there a full consideration given to the debtors and if not, would a partial consideration still hold the guarantors liable.
"8. Can an objection be filed pursuant to a tardy claim even if the same is delayed.
"9. Whether a claimant may seek full reimbursement from one of the guarantors in the probate court or whether one may seek only a pro rata share of a decedent's estate.
"10. Can there be a condition precedent pursuant to enforcing a guarantor's agreement and if so, is the same present in this matter." (Emphasis added.)
[2] The respective agreements entered into between Bagel Nosh and Robertson, Laurie, and the Wiatraks contained identical guarantee provisions, which read:

"FOR VALUE RECEIVED, the undersigned hereby unconditionally, jointly and severally, guarantee the payment of a lease dated * * * in the amount of * * * payable to (lessor's name), signed by Bagel Nosh of Michigan, Inc., and all extensions or renewals thereof, and all expenses * * *. Each of the undersigned hereby waive presentment, demand, notice of dishonor, protest, and all other notices whatsoever, and agree that the holder of said lease may from time to time extend or renew said lease for any period whatsoever and grant any releases, compromises or indulgences with respect to said lease or any extension or renewal thereof or any security therefor or to any party liable thereunder or hereunder, all without notice to or consent of any of the undersigned and without affecting the liability of any of the undersigned hereunder." (Emphasis added.)
The GECC guarantee, while not identical, was substantially similar to the above provisions.
[3] We are cognizant of the fact that the estate has not produced any writing evidencing the alleged refinancing agreement between Canfield and Bagel Nosh and of Canfield's assertion of the statute of frauds defense. MCL 566.132; MSA 26.922. However, because we dispose of this issue on other grounds, we need not address the merits of this defense.