George H. JENKINS, Jr., Plaintiff,

v.

HAWORTH, INC.; Richard J. Haworth; and Edward J. Clark, and Haworth/Houston, Inc., a Michigan corporation, Defendants.

George H. JENKINS, Jr., Plaintiff,

v.

HAWORTH, INC.; Haworth/New England, Inc.; Richard G. Haworth, and Edward J. Clark, Defendants.

Nos. G79–134, G79–419.

United States District Court,
W.D. Michigan, S.D.

Sept. 29, 1983.

Neil P. Coughlan, Reid & Riege, Hartford, Conn., for plaintiff.

John D. Tully, Joseph G. Scoville, Warner, Norcross & Judd, Grand Rapids, Mich., for defendants.

## OPINION

ENSLEN, District Judge.

Plaintiff in these consolidated diversity actions challenges his July 1979 termination as President of Haworth/New England, Inc., and the Defendants' assertion of a right to buy out his minority stock in that corporation pursuant to a contract formula. Haworth/New England operated in several states in the New England area, and was one of seventeen sales subsidiaries of Defendant Haworth, Inc. ("Haworth"), created to market Haworth's modular office furnishings across the country. Defendants Richard J. Haworth and Edward J. Clark were officers of Haworth and directors of Haworth/New England when, in connection with a decision to reorganize Haworth's marketing system, Haworth exercised its majority control over Haworth/New England to terminate Plaintiff and demand that Plaintiff surrender his shares for a formula price.

Plaintiff and four other subsidiary presidents filed a Complaint (case number G 79–134) in this Court on February 27, 1979, seeking injunctive relief against their anticipated terminations on a breach of contract theory. Plaintiff filed a separate action (case number G 79–419) in the Superior Court of the State of Connecticut two weeks later on March 12. In that Court, Jenkins sought and obtained an *ex parte* temporary injunction against his termination from Haworth/New England. Defendants removed the Connecticut case to the federal District Court for the District of Connecticut, which then transferred the action to this Court pursuant to 28 U.S.C. § 1404(a). In May 1979 Plaintiffs' Motion for a Preliminary Injunction in case number G 79–134 was denied, and Jenkins was enjoined from maintaining any duplicative state court actions. The other four plaintiffs in case number G 79–134 later dismissed their claims pursuant to stipulations.[1]

The Complaints as amended and the Pretrial Order disclose four main theories by which Plaintiff seeks relief. He claims that his termination from employment with Haworth/New England and the use of a specified buy-out formula in computing his equity in the company, constitute a breach of the Defendants' agreements with him. In a shareholders derivative claim, Plaintiff asserts that the Defendants breached their fiduciary duties as directors of Haworth/New England by voting to terminate Plaintiff and repurchase his shares, and by deciding to fold the subsidiary system. Jenkins also contends that he and/or Haworth/New England were franchisees under Connecticut's Franchise Act and that his termination without cause was in violation of that state law. Finally, Plaintiff seeks to recover commissions and other

---

1. Two of those subsidiary presidents were still pursuing their claims against Haworth in another jurisdiction at the time this case was tried.

compensation which he claims remain owing to him, plus double damages, costs and attorney fees under a Connecticut wage statute.

The case was tried to the Court in December 1982, and final post-trial briefs were received in April 1983. Having reviewed the testimony of the witnesses and all of the other evidence submitted to the Court,[2] and having read the briefs and authorities cited by the parties, the Court makes the following findings of fact and conclusions of law, in accordance with Federal Rule of Civil Procedure 52(a).

### The Haworth Product and Development of the Subsidiary System

Haworth is a private, closely held Michigan corporation which has since at least 1959 been engaged in the manufacture and sale of office partitions and furniture. In 1971 the company introduced a line of office modules, and by 1976 had decided to focus entirely on the manufacture and sale of open office systems. Such systems consist of free standing components that can be assembled to define and create office spaces tailored to the needs of the client, providing an alternative to the traditional division of office space by means of permanent floor-to-ceiling walls. In conjunction with its decision to focus on the open office system, Haworth overhauled its identity, changing its name (previously Modern Partitions), as well as its logo, graphics and advertising.

Haworth had always relied almost exclusively on independent manufacturer representatives to market its products. To obtain more concentrated product representation and yet avoid the high capital outlay associated with establishing an employee sales force, in 1975 Haworth's Vice President in Charge of Marketing, Clarence Handlogten, devised the sales subsidiary system. Under this system, which Haworth adopted and put into effect in 1975 and 1976, seventeen subsidiaries were created to develop markets and solicit sales for Haworth in designated territories across the country.

New England was to be one of the designated territories, and was to include the states of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island and Vermont. Like the other subsidiaries, Haworth/New England would be governed by three main documents:[3] a preincorporation subscription agreement ("Preincorporation Agreement") entered into between Haworth and the subsidiary president (identified as "Manager" in the agreement) (Ex. 8); Articles of Incorporation and By-laws (Ex. 11); and a Shareholder's Buy and Sell Agreement ("Buy/Sell Agreement") entered into between the subsidiary and its shareholders (Ex. 7). Briefly, under these documents, Haworth was to own 55% of the stock in Haworth/New England, while 45% was to be owned by an individual salesperson. That person would be employed as the subsidiary president and was to have general control of the sales activities of the subsidiary, and supervise any subsidiary employees. The president was also to be the Chief Executive Officer of the subsidiary, and one of the subsidiary's three directors; the other two directors would be officers of Haworth. The subsidiary was to receive a commission from Haworth of 7½% (or less if agreed) on the net selling price received by Haworth for sales in the territory. The subsidiary president would set his own compensation and allocate the subsidiary's commission income to other expenses as well. While the subsidiary would not be granted exclusive sales rights in its territory, Haworth was not to establish any other subsidiaries there, and any inter-territory business was to be conducted under an agreed-upon commission arrangement.

---

2. In addition to marked exhibits, the Court has reviewed a Haworth slide presentation which had been purchased by Haworth/New England, as well as various advertisements and pamphlets on the Haworth product. These items were submitted for the Court's review by the Plaintiff, without objection by Defendants.

3. A Funding Agreement (Exhibit 9) was also part of the contract documents, but is not of any particular relevance here.

The contract documents contained specific provisions relating to the termination of the president's employment with the subsidiary and the disposition of the president's shares upon such termination. Paragraph 11 of the Preincorporation Agreement provided that "in no case shall the Board of Directors be limited in the continuance or discontinuance of the Manager as Chief Executive Office[r] (sic) of the Company." And under the By-laws, "[e]ach officer shall hold office at the pleasure of the board. The board of directors may remove any officer for cause or without cause." (Ex. 11, Art. VII, Section 2). The president/shareholder's interest in the subsidiary was subject to the Buy/Sell Agreement, which gave the subsidiary an option to purchase all shares of any shareholder who "having been involved with the [subsidiary] on a full-time basis shall be terminated for any reason." (Ex. 7, ¶ 3(a)(iii)). And "when such option result[ed] from an involuntary event including . . . termination from full-time employment," the subsidiary would be required to purchase the shares. (Ex. 7, ¶ 3(b)(iii)). When the purchase of the shares was due to termination from full-time employment, the purchase price paid upon the exercise of the subsidiary's mandatory option would be computed in one of two ways: (a) the price would be established by a written offer made by a bona fide purchaser who had the qualifications and financial ability to replace the president/shareholder and run the subsidiary on a full-time basis; or (b) if no such offer was received, the price would be set by a formula based on past commissions earned by the company and the company's book value. (Ex. 7, ¶ 4). The Buy/Sell Agreement also provided that it should not be deemed to "prevent or restrict any merger or consolidation of the company." (Ex. 7, ¶ 5).

Haworth predicted that under this system, the subsidiary president would be motivated by pride of ownership and by the potential for build-up of equity, which was made dependent upon the success of the subsidiary. These incentives, plus the fixed commission rate and territory, offered the subsidiary president a relatively stable position when compared to that of the independent sales representative or sales employee. At the same time, Haworth anticipated that the subsidiaries would enable Haworth to handle increased sales, projected because of a new electrified panel system which it had developed and planned to introduce in 1976. The subsidiaries were also expected to strengthen Haworth's recognition in the marketplace by presenting a unified image, since each subsidiary would bear the name Haworth along with its territory designation. Handlogten testified that he viewed the subsidiary program as an innovative one, and that to his knowledge no similar program had ever been implemented in the office furniture industry.

### Plaintiff's Contract

In early 1976, Jenkins learned of an opportunity to become president of the Haworth sales subsidiary to be established in the New England area. At the time, he was employed as a salesman by one of Haworth's main competitors, and was living in Connecticut. Plaintiff indicated his interest in the position, and through a friend arranged to meet with Haworth management. In April 1976 Haworth flew Jenkins to Holland, Michigan, where Plaintiff was introduced to the Haworth product line, interviewed, and discussed the subsidiary program with various Haworth personnel, primarily Clarence Handlogten. In those discussions, Handlogten stressed the relative stability of the subsidiary program and the potential for building up equity in the subsidiary corporation, but he did not represent to Plaintiff that he could never be terminated. In fact, it was always clear that under the subsidiary system Haworth would retain ultimate control. The fact that under the program outlined to him the subsidiary's territory would not be cut, and that the commission was fixed at 7½%, were features that Plaintiff found particularly attractive.

Plaintiff returned to Connecticut and later that week was offered the position as president of Haworth/New England.

Plaintiff had already decided that if offered the job he would accept, and it was decided that he would start as early as possible in May. On May 4, 1976 Plaintiff flew to Michigan, and delivered a resignation letter to his former employer, backdated to April 30, 1976. On the following day, Handlogten gave Plaintiff the Preincorporation Agreement and the Buy/Sell Agreement for review.

On Thursday, May 6, having read the documents the evening before, Plaintiff met with Handlogten and discussed his concerns about certain provisions. He specifically raised concerns about paragraphs 5, 11 and 17 of the Preincorporation Agreement, and changes were made in paragraphs 5 and 17. The Preincorporation Agreement and Buy/Sell Agreement were signed that day, but were backdated to May 3. Plaintiff testified at trial that he could not recall whether he had received a copy of the proposed By-laws of Haworth/New England the day before, together with the Preincorporation and Buy/Sell Agreements. However, at a preliminary injunction hearing in 1979, Plaintiff testified that he did receive the By-laws on May 5 and had a chance to review them. And at trial Plaintiff conceded that he would not have signed the other agreements without reading the By-laws, which were specifically referred to in paragraph 2 of the Preincorporation Agreement. I find that Plaintiff had an opportunity to review the By-laws at some time before he signed the Preincorporation Agreement and Buy/Sell Agreement on May 6. The By-laws were adopted May 7 by the directors of Haworth/New England, including Plaintiff. The pertinent terms of the agreements were as described above.

*Termination of the Subsidiary System*

Although Haworth experienced good growth during the period in which the subsidiaries were in operation, in late 1978 Haworth decided to dismantle the subsidiary system and convert to a company-employee sales force. Haworth had originally entered the subsidiary program with the intention of sticking with it, but various problems had arisen during its existence. Because of the local autonomy of the various subsidiary presidents, there was some inability to maintain uniformity in sales approaches and representation across the country. In addition, Haworth felt that the long term interests of both Haworth, Inc. and the subsidiary corporations were damaged by the failure of the subsidiary presidents to build a strong sales force of subsidiary employees. The subsidiary presidents maintained a high level of salaries for themselves, while paying subsidiary employees a lower than market rate for their sales services, resulting in heavy turnover at the employee level. For this reason, it did not appear that the subsidiaries would be able to accommodate the growing number of sales. Moreover, the subsidiaries tended to seek out sales in which they dealt directly with an end user, thus avoiding a dealer and receiving extra compensation in the form of "overage." [4] Haworth felt that the dealer network was important in establishing Haworth's long term growth goals.

In late 1978, Haworth management met with all of the subsidiary presidents, to discuss these and other problems perceived by Haworth. However, Haworth felt that the responses of the subsidiary presidents evidenced an unwillingness to change the system and an inability to recognize the significance of the subsidiary program's weaknesses, and in early 1979 the final decision to change its marketing system was made. In February of that year, Haworth management offered each subsidiary president employment as a regional or divisional president under a new company-employee sales force system, plus the formula price for their minority shares. All except six of the subsidiary presidents accepted the offer.

Jenkins was offered a salary plus a bonus, and the book value of Haworth/New

---

**4.** Overage is the difference between the actual selling price and Haworth's dealer list price. After deductions of expenses normally borne by the dealer, the net overage was paid to the subsidiary. This practice changed during the course of the subsidiary system, so that Haworth retained part of the overage for itself.

England in exchange for his minority stock. In response, he filed these actions. After the expiration of the *ex parte* injunction that Plaintiff had obtained in Connecticut, the Haworth/New England Board met and resolved to remove Jenkins and his wife as officers and employees of the subsidiary and to exercise the subsidiary's option to repurchase Jenkins' shares. That action was taken on July 26, 1979, with notice to Plaintiff and his attorneys, and Haworth/New England's operations were terminated at the end of July.

### Breach of Contract Claim

Plaintiff claims that by terminating him [5] from his employment with Haworth/New England and dismantling the subsidiary system, Haworth breached its agreement with him, and deprived him of the full equity value of his shares. To that end, at trial Plaintiff sought to introduce evidence that the contract documents (the Preincorporation Agreement, the Buy/Sell Agreement, and the Haworth/New England By-laws) were not a complete integration of the parties' intent with regard to termination of Plaintiff's employment. Specifically, Plaintiff claimed that Handlogten had orally assured him that he would not be terminated as long as the subsidiary was profitable. In addition, Plaintiff sought to introduce evidence regarding the fair market value of Haworth/New England as the measure of the buy-out price for his stock. While much of Plaintiff's contract claim was disposed of by rulings on this evidence

during trial, I review this claim now in light of all of the evidence and the post-trial briefs of the parties.[6.]

At trial I found that Plaintiff had failed to establish that the agreement was ambiguous with regard to termination of employment, and a review of all of the evidence confirms that Plaintiff could be terminated with or without cause in all his capacities in connection with Haworth/New England. Paragraph 11 of the Preincorporation Agreement specifically provided that Plaintiff could be terminated as Chief Executive Officer of the Company. Under the By-laws, the Board of Directors of Haworth/New England was given the power to terminate Plaintiff as Subsidiary President, with or without cause. And upon termination from full-time employment, Plaintiff's status as shareholder was immediately subject to the subsidiary's mandatory repurchase option.

Plaintiff testified that he had had some concerns about paragraph 11, and had discussed them with Handlogten prior to signing the agreements. However, unlike the modifications Plaintiff was able to obtain in paragraphs 5 and 17, Handlogten told Jenkins that paragraph 11 could not be changed. Jenkins himself was unable to point to any ambiguity in the written agreements with regard to termination. He testified that he saw no distinction among the terms manager, chief executive officer, president and shareholder, as they applied to him. Moreover, upon questioning by the Court, Plaintiff conceded that

---

**5.** As noted above, Plaintiff was "terminated" only in the sense that he was removed from his position with Haworth/New England, when Haworth reorganized its marketing scheme. Plaintiff was offered a similar position as a Haworth employee.

**6.** At trial, the Court took Plaintiff's offer of Exhibit 3 under advisement, and accepted Exhibit 4 conditionally, subject to foundational requirements. Plaintiff offered Exhibit 3, a packet of materials applied to some recruits to the subsidiary system, but not to Plaintiff, to show the kind of representations made regarding the program. Handlogten did testify that the description of the program given to Plaintiff matched the general promotional literature which had been supplied to earlier recruits.

Therefore, I allow Exhibit 3 although I find that its probative value is marginal, and that it does not alter my conclusions and findings regarding the lack of ambiguity in the contract agreements.

Exhibit 4 is another writing which was never communicated to Plaintiff. Defendant objected to its admission on the ground that there was no foundation. The document, an exhibit to the Handlogten deposition, was never mentioned in Handlogten's deposition testimony, and thus no foundation for its admission was ever laid. Therefore I sustain Defendant's objection. I note however that even had I allowed this evidence, it would not have altered my findings or conclusions in this case.

this aspect of the contract had never been unclear to him:

> THE COURT: .... Did you then realize ... that if these two people [the majority directors of Haworth/New England] decide to terminate you for any reason—
> THE WITNESS: I am dead.
> THE COURT: They can do so by the last sentence of paragraph 11?
> THE WITNESS: That is true. That is true. That is 100 percent true.

Plaintiff is a college graduate, who has been engaged in sales since 1959. He read the contract documents, and discussed them with Handlogten, going so far as to request certain changes. He clearly understood that under the terms of the agreement Haworth management retained control, and could terminate him with or without cause.

■ Because of the lack of ambiguity of the contract documents with regard to Haworth's right to terminate Plaintiff's employment with or without cause, the parol evidence rule precluded the admission of contradictory terms. Thus Plaintiff's testimony that he had been told that profitability was the key to his continued employment, was not allowed for the purpose of varying the agreement.

> "When two parties have made a contract and have expressed it in writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing. 3 Corbin on Contracts, Section 573."

*NAG Enterprises, Inc. v. Allstate Industries, Inc.,* 85 Mich.App. 194, 198, 270 N.W.2d 738 (1978), *rev on other grounds,* 407 Mich. 407, 285 N.W.2d 770 (1979). *Vergote v. K-Mart Corporation,* 125 Mich. App. 48, 52, 336 N.W.2d 229, 230–231 (1983). *Accord, In Re Bluestone Estate,* 121 Mich. App. 659, 665, 329 N.W.2d 446 (1982).

I do not find that *Schipani v. Ford Motor Company,* 102 Mich.App. 606, 302 N.W.2d 307 (1981) requires a different result. Plaintiff argued in his pretrial brief that *Schipani* allows consideration of an employer's written or oral assurances of continued employment, despite written agreements providing for termination at will. However, in that case, it was unclear whether the promises allegedly made outside of the contract followed or preceded the written agreement, and the parol evidence rule was never discussed. I find the language of the Michigan Supreme Court in *Toussaint v. Blue Cross and Blue Shield of Michigan,* 408 Mich. 579, 610, 292 N.W.2d 880 (1980), dispositive here:

> *Employers are most assuredly free to enter into employment contracts terminable at will without assigning cause.* We hold only that an employer's express agreement to terminate only for cause, or statements of company policy and procedure to that effect, can give rise to rights enforceable in contract. (emphasis added.)

■ In his post-trial brief, Plaintiff argues that in order to give effect to his right under the Buy/Sell Agreement to seek a bona fide purchaser, there must be an implicit obligation on the part of Haworth management and the majority shareholders of Haworth/New England to continue the subsidiary corporation's existence. In support of this argument, Plaintiff cites *Lichnovski v. Ziebart International Corporation,* 414 Mich. 228, 324 N.W.2d 732 (1982). In that case the employment agreement specifically provided for termination only for cause, and the court simply pointed to the plaintiff's right to sell a license agreement as an additional indication of that contract right. The instant case is distinguishable, since under the agreements Plaintiff could be terminated with or without cause. More importantly, the Buy/Sell Agreement precludes Plaintiff's argument. Paragraph 5 of that document specifically states that "nothing contained in this Agreement shall be deemed to prevent or restrict any merger or consolidation of the Company." Haworth's actions were entirely consistent with its rights under the agreements.

■ Theoretically, under the terms of the Buy/Sell Agreement, Plaintiff could have

sought a bona fide purchaser who met the strict requirements of the agreement. However, Jenkins did not do so, for the obvious reason that he could not have found such a purchaser given Haworth's decision to terminate the subsidiary system. That fact does not confer a right on the Plaintiff to now seek to recover the "fair market value" of Haworth/New England. Instead, such circumstances brought into play the formula price set out in Paragraph 4(b) of the Buy/Sell Agreement. By mandating that Haworth pay Plaintiff a substantial compensation for the equity he had built in the subsidiary corporation, the formula served to protect rather than harm Plaintiff under such circumstances. No similar protection would have been available had Plaintiff been an independent sales representative. A contractual formula price is enforceable, even over the objection that the formula price is less than fair market value. *E.g. Keating v. BBDO International, Inc.,* 438 F.Supp. 676, 683 (S.D.N.Y.1977).

█ I conclude that under the terms of his agreement, Jenkins is entitled to recover only the formula buy-out price for his shares in Haworth/New England. The parties did not dispute the mechanics of that formula, and I find that Defendants' calculation of $59,359.00 as the buy-out amount is correct. (Ex. KK). Therefore, judgment will be entered against Defendant Haworth, Inc. and for the Plaintiff in this amount, and in exchange for such payment, Plaintiff will be ordered to surrender his original stock certificate to the Defendants, properly endorsed.

### Connecticut Franchise Act Claims

Plaintiff asserts that Haworth/New England and Haworth, Inc. stood in the relationship of franchisee and franchisor, as defined by the Connecticut Franchise Act ("the Act," C.G.S. § 42–133e, *et seq.*), and thus Plaintiff's termination without cause was in violation of Connecticut General Statute § 42–133f.[7] I note, as do Defend-

ants, that the precise nature of Plaintiff's claim is somewhat unclear. In the Pretrial Order, the legal issue was framed as whether or not Haworth/New England, Inc. was a franchisee of Haworth. However, Plaintiff now appears to argue that *he personally* was the franchisee under the agreements. This apparent shift in Plaintiff's argument may be improper at this time, however I find it of no consequence, since Plaintiff was simply the employee of Haworth/New England, and the agreements conferred upon Plaintiff no rights to market or sell Haworth products separate from those conferred upon Haworth/New England. Thus the only possible "franchise" involved here is the subsidiary. Defendants also argue that Plaintiff has no standing to assert a Franchise Act claim in the name of the subsidiary. Because I find that under the terms of the statute Haworth/New England could not have been a franchisee of Haworth, I need not address that issue here.

█ The parties agree that a "franchise" under the Connecticut statute must be an oral or written agreement which meets three criteria: (1) the franchisee is granted the right to engage in the business of offering, selling or distributing goods or services; (2) under a marketing plan or system prescribed in substantial part by a franchisor; and (3) the operation of the franchisee's business pursuant to such plan is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol. C.G.S. § 42–133e(b). They further agree that the third criterion is present in this case. However, the meaning and application of the first two factors is heavily disputed. Unfortunately, the Connecticut courts are of no assistance, since they have interpreted the Act rarely since its passage in 1972, and have not been confronted with the specific issues presented here. Thus I turn first to the language of the statute to determine if the Connecticut legislature in-

---

**7.** At trial, the parties stipulated that as a matter of conflicts of law, the Connecticut Franchise Act would apply.

tended to include within the reach of the Act the type of relationship which existed between Haworth and Haworth/New England.

■ I find that a review of the definitions contained in the Act clearly indicates that a parent corporation cannot grant a franchise to its subsidiary, and thus here, the parties may not be found to stand in a franchisor-franchisee relationship within the meaning of the Act. Section 42–133e(c) defines "franchisor" as "a person who grants a franchise to another person. . . ." This definition is clarified by the special meaning given to the term "person" in the Act:

> A natural person, corporation, partnership or other entity and, *in case of an entity, includes any other entity which has a majority interest in such entity* or effectively controls such other entity as well as the individual officers, directors and other persons in the active control of the activities of such entity. (C.G.S. § 42–133e(a), emphasis added.)

■ Under this definition of person, when Haworth made Haworth/New England its sales representative, while retaining a controlling interest in its stock, it was not acting as a "franchisor," since it did not grant anything to "another person." Thus the Act does not apply.

Logic and common sense suggest such a result even without recourse to the language of the statute. One of the essential aspects of the subsidiary form of organization is the control retained by the parent corporation; a franchise agreement is an unnecessary addition to the legal relationship. Such control was precisely the aim of Haworth when it set up the subsidiary marketing system at issue here. In fact, Handlogten testified that it was the intent of Haworth to steer away from the franchise model, when it was formulating the subsidiary system. The term "franchise" nowhere appears in the written agreements and it was surely not contemplated by the parties. While these factors are not determinative, they lend support to the conclusion that the Act does not apply to the subsidiary form

implemented by Haworth. I note also that none of the cases cited by either of the parties involved a claim by a subsidiary that it was a franchisee.

■ Even were I to find that Haworth could be a franchisor within the meaning of the Connecticut Franchise Act, I am not persuaded that Haworth/New England was granted the right to "offer, sell or distribute" Haworth products. At trial, Jenkins conceded that Haworth/New England was not a distributor, since it never purchased any products from Haworth, never maintained an inventory, and never resold products. Plaintiff argues instead that Haworth/New England was granted the right to "sell." Defendants contend that in order to come within the protection of the Act, the alleged franchisee must pass title to goods rather than just solicit sales.

Only one case has addressed the meaning of "selling" under the Act. In fairly perfunctory fashion, the court in *George R. Darche Associates v. Beatrice Foods Co.,* 538 F.Supp. 429 (D.N.J.1981), *aff'd.* 676 F.2d 685 (CA3 1982) held that an independent sales agent which simply solicited orders for the defendant's products did not "offer" or "sell" within the meaning of the Connecticut statute. The Act does seem to contemplate that a franchisee take title to goods, since one provision of the Act refers to inventories, supplies and equipment purchased from the franchisor. C.G.S. § 42–133f. Here, Haworth/New England was responsible for representing Haworth to markets in the New England area. Orders were accepted by Haworth, and credit terms, collection, warranties, and shipping were all handled by the parent company. While the Preincorporation Agreement refers to "sales" and "selling" by the subsidiary, it also states that the subsidiary is to "act as the *representative* for Haworth, Inc. in the sale of [the products]." (Ex. 8, ¶ 5, emphasis added).

Plaintiff is unable to cite any cases substantially similar to the present one. He relies heavily on one Wisconsin case, which interprets the meaning of "selling" under

that state's franchise law to include a manufacturer's representative. *Wilburn v. Jack Cartwright, Inc.,* 514 F.Supp. 493 (E.D.Wis. 1981), *rev'd and remanded* 676 F.2d 698 (CA7 1982), *aff'd on remand* 543 F.Supp. 174 (E.D.Wis.1982). The Wisconsin statute, Wis.Stat. § 135.01 *et seq.,* is not identical to the Connecticut law, and it also appears that not all of the Courts in Wisconsin would interpret the Wisconsin statute to include manufacturer's representatives. *E.g. Foerster, Incorporated v. Atlas Metal Parts Company,* 105 Wis.2d 17, 313 N.W.2d 60 (1981); *O'Leary v. Sterling Extruder Corp.,* 533 F.Supp. 1205 (E.D.Wis.1982); *Quirk v. Atlanta Stove Works, Inc.,* 537 F.Supp. 907 (E.D.Wis.1982). Of course, this Court is not bound by any of these cases, since they do not interpret Connecticut law. But I find *Wilburn* unpersuasive in light of *Foerster* and the other Wisconsin cases.

To a certain extent, the question of whether or not Haworth/New England was given the right to engage in "selling" under the Act illustrates the difficulty of applying the terms of the Act in the parent-subsidiary context. The actual "selling" was a joint effort on the part of both parent and subsidiary, making it difficult to find that Haworth/New England was granted a distinct "right to sell." There is a functional difference between the subsidiary system implemented by Haworth and the traditional franchise arrangement, such as a distributorship or retail seller. I conclude that the Act's protections cannot apply in this case, and that Plaintiff's claim under the Connecticut Franchise Act must be denied.

### Breach of Fiduciary Duty Claims

■ In his Complaint and in the Pretrial Order, Plaintiff asserts that the Defendants, particularly the individual Defendants who were also directors of Haworth/New England, violated their fiduciary duty to Haworth/New England in voting to terminate Plaintiff and repurchase his shares, and in voting to terminate the subsidiary system.[8] I find that there was no breach of duty as to Plaintiff, since he agreed to the mandatory repurchase provision, and that he has no standing to assert any claim derivatively on behalf of the subsidiary, since he lost his right to shareholder status when he was terminated from full-time employment.

■ As noted above, the Buy/Sell Agreement signed by Plaintiff provided for the mandatory repurchase of Plaintiff's shares, upon his termination from full-time employment. (Ex. 7, ¶ 3(b)(iii)). Plaintiff had also clearly agreed that Haworth would not be prevented or restricted as to any merger or consolidation of Haworth/New England. (Ex. 7, ¶ 5). Where, as here, the minority shareholder has consented in a shareholder's agreement to mandatory repurchase of his shares upon termination from employment, there is no requirement that the majority act only for a valid business reason and on fair terms. *Coleman v. Taub,* 638 F.2d 628 (CA3 1981).

> ... a minority shareholder may bargain away the "additional interest" in corporate participation which might otherwise be the basis for a fiduciary duty on the part of the majority.... There is no reason why an appeal to general fiduciary law should be used by either party as a pretext for evading his contractual obligations. *Id.* 638 F.2d at 636.

■ In this case, the majority clearly did not act solely in order to "freeze out" Plaintiff from participation in its marketing scheme, since Haworth offered Jenkins a similar position as an employee. By the vote of its Haworth/New England directors, Haworth was exercising its clear contractual rights to terminate Plaintiff's employment, repurchase Plaintiff's shares

---

**8.** Plaintiff has never briefed his fiduciary duty claims, thus making it difficult for the Court to determine on exactly what legal authority Plaintiff rests. The only authority which appears to go to this issue, was submitted to the Court by Plaintiff, with a letter dated May 11, 1983. That letter responded to the Defendant's argument that Plaintiff is without standing, and attached a copy of a slip opinion from the United States District Court for the District of Massachusetts, *Imperial Motors, Inc., v. Chrysler Corporation,* 559 F.Supp. 1312 (3/25/83). That case is discussed below.

in Haworth/New England, and become the sole owner of Haworth/New England. Even if something more is required in such circumstances, Haworth has offered legitimate business reasons of its own for its decision, and treated Plaintiff and other subsidiary presidents fairly. The law requires no more. *Tanzer v. International General Industries, Inc.,* 379 A.2d 1121 (Del. 1977).

■ Once Plaintiff was no longer a shareholder of Haworth/New England, due to the applicability of the mandatory repurchase provision, he lost any right to bring a derivative claim on behalf of Haworth/New England. Plaintiff's assertion that Defendants Richard Haworth and Edward Clark breached their duties as directors of Haworth/New England by allowing Haworth to cease doing business with it, is an allegation of a corporate right. *See Davis v. Comed, Inc.,* 619 F.2d 588, 593 (CA6 1980) *reh. den.,* 623 F.2d 28 (1980). Since this claim is asserted derivatively on the subsidiary's behalf, any recovery belongs to the subsidiary. *Id.* In order to maintain a derivative claim, a plaintiff must maintain his shareholder status throughout the pendency of the lawsuit; an action will abate if plaintiff loses his shareholder status before the litigation ends. *Issen v. GSC Ent., Inc.,* 508 F.Supp. 1278, 1295 (N.D.Ill.1981); *Davis v. Comed, Inc., supra; Yanow v. Teal Industries, Inc.,* 178 Conn. 262, 422 A.2d 311, 323 (1979). This rule applies even where the derivative plaintiff sells his shares during the pendency of the lawsuit. *Davis v. Comed, Inc., supra* at 591. Plaintiff argues that *Imperial Motors, Inc. v. Chrysler Corporation,* 559 F.Supp. 1312 (D.Ma.1983), requires a different result. However, that case relates specifically to standing under the federal Dealers Day In Court Act, 15 U.S.C. § 1221–5, and merely carves out a *statutory* exception to the general rules outlined above.

For these reasons, Plaintiff's fiduciary claims must also fail.

*Claim for Commissions and Overage*

Plaintiff makes two claims with regard to commissions and overage.[9] First, he claims that he is entitled to commissions and overage on "open" orders, that is, orders booked but not yet shipped prior to his termination. This argument is based on Plaintiff's assertion that there was no express agreement as to when commissions were earned, but only as to when they were paid. In a related argument, Plaintiff asserts that the commissions and overage which he claims were due him when he was terminated constitute "wages" within the meaning of the Connecticut wage statute, C.G.S. § 31–71a *et seq.* That statute requires payment of wages within one working day after an employee is terminated (C.G.S. § 31–71c(b)), and violation of this provision subjects the employer to double damages, attorneys fees and costs. C.G.S. § 31–72.

1. *Commissions on Open Orders.*

■ The Preincorporation Agreement provided:

> For those of Haworth's products which are sold by Company [Haworth/New England], it is agreed that Company shall have a seven and one-half percent (7½%) commission on the net selling price *received* by Haworth....

(Ex. 8, ¶ 7).

In July 1976, Jenkins received a memorandum (Ex. W) from a financial officer of Haworth, which clarified this provision in the course of explaining the first quarterly financial reports for the subsidiary. With specific regard to the income statement contained in the quarterly report, the memo stated: "We use 'accrual accounting' which means that commissions are credited when *earned (in month of shipment)* not when paid." (emphasis added). This written definition was confirmed by the consistent practice between Haworth and its subsidiaries, after the agreements were signed. Plaintiff testified that the memorandum re-

---

**9.** During the trial, Plaintiff stated that his action did not lie in "procuring cause," and he withdrew that claim.

flected his agreement and understanding with Haworth, Inc., and that he had never been told or led to understand that commissions were earned at the time orders were received by Haworth. In fact, Plaintiff was able to articulate no factual basis from which he might have concluded that Haworth/New England earned commissions prior to shipments. On cross-examination Plaintiff testified:

> Question: So the subsidiary consistent with Haworth policy earned a commission during the month of shipment? . . .
>
> Answer: Earned, yes.

During the time in which the subsidiary system was in operation, a long "lead time" developed between order and shipment. However, there was no evidence that any relief was sought by subsidiary presidents, including Plaintiff, in the form of altering the policy and practice of Haworth of considering commissions earned only as of the date of shipment. In fact, on February 22, 1979, when Haworth was in the process of implementing its decision to shut down the subsidiary operation, Haworth's Vice President of Sales, James Meier, issued a memo to all the subsidiary presidents, including George Jenkins, regarding commission earnings. In that memo (Ex. 29, p. 2), Meier states:

> To clarify a point on the timing of the subsidiary change over, be advised that per our earlier statement the subsidiaries will run as usual until March 31, 1979. All scheduled shipments through March 31, 1979 will be credited to the subsidiaries that remain as of that date. In other words, we will not use actual ship dates but the scheduled dates until March 31, 1979 inclusive.

This memo demonstrates an understanding that even in the context of termination of the subsidiary system, commissions earned would be based upon the shipment date.[10]

Because of this clear understanding and practice which governed the conduct of Haworth and its subsidiaries throughout the course of their existence and upon their termination, the Court refused to allow testimony at trial regarding the practice of other companies in the industry with regard to payment of commissions upon termination of a sales representative. I find that Plaintiff was not entitled to receive credit for commissions or overage on orders shipped after July 1979.[11]

### 2. *Connecticut Wage Statute.*

■ I find that Plaintiff's claim that Defendants are liable for double damages, attorneys fees and costs for failing to timely pay Plaintiff's "wages" also fails on its merits. Haworth/New England's bank account summary (Ex. V) reflects that Plaintiff received money from Haworth/New England as salary, interest or principal on loans, and for expenses. On February 7, 1979 Jenkins also drew a bonus for 1978 in the amount of $11,080.50. Plaintiff received his salary for July 1979 prior to his termination, and all loans he had made to Haworth/New England had been repaid by that time.

While Plaintiff has correctly pointed out that the Connecticut definition of wages includes commissions (C.G.S. § 31–71a(3)), in this case commissions were earned by the subsidiary, not Plaintiff. The total commissions and overage earned by Haworth/New England on orders shipped prior to the end of July 1979 was $105,873.72. Of that, $70,-002.27 had been paid to Haworth/New England prior to Plaintiff's termination, and the additional $35,871.45 was credited to Haworth/New England in the computation of its book value. Plaintiff is entitled to

---

**10.** I note that as a result of the temporary injunction Plaintiff obtained in Connecticut, he actually received credit for commissions long past this March 31 date. He received a salary through July 1979, and Defendants included commissions and overage earned by Haworth/New England through the end of July, in computing the subsidiary's book value.

**11.** Of course, overage and commissions were actually earned by the subsidiary, not Plaintiff. Therefore even if Haworth/New England had been entitled to additional overage and commissions, they would have only been payable to Plaintiff as part of the subsidiary's book value.

receive this money as part of the formula price for his shares, but that does not bring it within the statutory definition of wages, since it is not "compensation for labor or services rendered by an employee" (CGS § 31–71a(3)), but is simply payment for shares of stock.

I find that no salary or wages were owing to Plaintiff on the date of his termination from employment, and therefore, the provisions of the Connecticut statute may not be invoked.

### Conclusion

For the reasons set forth above, the Court will issue an Order Granting Judgment against Defendant Haworth, Inc. only, and in favor of the Plaintiff, in the amount of $59,359.00, representing the buy-out price for Plaintiff's shares under the terms of the Preincorporation Agreement. Plaintiff will be ordered to endorse and surrender his original stock certificate to Defendants. Judgment will be entered against Plaintiff and in favor of the Defendants, on all other claims asserted by Plaintiff.

In their post-trial briefs, Defendants urge the Court not to award any prejudgment interest to Plaintiff, since Defendants were always willing to pay the buy-out amount and thus any delay in obtaining the judgment is attributable only to the Plaintiff. Plaintiff has made no specific request with regard to interest. In diversity actions, the federal courts apply the state court's law on prejudgment interest. *Glens Falls Insurance Company v. Danville Motors, Inc.,* 333 F.2d 187 (CA6 1964); *Clissold v. St. Louis-San Francisco Railway Company,* 600 F.2d 35 (CA6 1979).

In this case, it is not entirely clear whether the Court should apply Michigan or Connecticut law on prejudgment interest, since one of the consolidated actions was filed in Connecticut while the other was filed in Michigan. Connecticut allows prejudgment interest as damages for the detention of money after it becomes due, at the statutory rate of 8 percent. C.G.S. § 37–3a. An award of interest under this statute is discretionary with the Court; the determination is guided by the interests of justice and whether detention of the money was wrongful. *Southern New England Contracting Company v. State of Connecticut,* 165 Conn. 644, 345 A.2d 550, 560 (1974); *Slattery v. Maykut,* 176 Conn. 147, 405 A.2d 76, 81 (1978). In Michigan, on the other hand, statutory interest "shall be allowed" from the date the action is filed. M.C.L.A. § 600.6011(1), (2). Of course here, Plaintiff's right to the buy-out price accrued only upon his termination in July, rather than in February 1979 when his first action was filed. Therefore, prejudgment interest runs from the later date. *Foremost Life Insurance Company v. Waters,* 125 Mich. App. 799, 803, 337 N.W.2d 29, 31 (1983).

While Defendants have not refused to pay the buy-out amount to Plaintiff, they have had the use of that money since 1979. For this reason, I find that justice is best served in this case by granting payment of prejudgment interest from the date of Plaintiff's termination, July 26, 1979. Because the parties expressly stated in their Buy/Sell Agreement that Michigan law would govern their rights under that document, I apply the Michigan prejudgment interest statute. Thus, Plaintiff is entitled to interest on the judgment amount at the rate of 6 percent per year from July 26, 1979 to June 1, 1980, and at the rate of 12 percent per year thereafter until the judgment is satisfied. M.C.L.A. § 600.6013(2); 28 U.S.C. § 1961.

Finally, because Plaintiff has prevailed on what was essentially an issue uncontested by the Defendants, I find it inappropriate to award costs to either Plaintiff or Defendants.

### JUDGMENT ORDER

In accordance with the Opinion issued in the above captioned case, dated September 29, 1983;

IT IS HEREBY ORDERED AND ADJUDGED that a Judgment against Defendant Haworth, Inc. only, and in favor of the Plaintiff, shall be entered in the amount of

$59,359.00, with interest at the rate of 6 percent per year from July 26, 1979 to June 1, 1980, and at the rate of 12 percent per year thereafter until the Judgment is satisfied.

Plaintiff is Ordered to endorse and surrender his original stock certificate to Defendants, and Judgment is hereby entered against the Plaintiff and in favor of the Defendants on all other claims. Plaintiff and Defendants are to bear their own costs.