**PUBLISHED**

# UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

DONALD F. RIESETT,
                    *Plaintiff-Appellant,*

v.

W.B. DONER & COMPANY; DONER
INTERNATIONAL, LIMITED, d/b/a Doner
& Company, Limited, d/b/a Doner
Cardwell Hawkins,
                    *Defendants-Appellees.*

No. 01-2307

DONALD F. RIESETT,
                    *Plaintiff-Appellee,*

v.

W.B. DONER & COMPANY; DONER
INTERNATIONAL, LIMITED, d/b/a Doner
& Company, Limited, d/b/a Doner
Cardwell Hawkins,
                    *Defendants-Appellants.*

No. 01-2339

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Frederic N. Smalkin, Chief District Judge.
(CA-00-2026-S)

Argued: May 8, 2002

Decided: June 6, 2002

Before WILKINSON, Chief Judge, and WILKINS and
LUTTIG, Circuit Judges.

Affirmed in part and vacated and remanded in part by published opinion. Judge Luttig wrote the opinion, in which Chief Judge Wilkinson and Wilkins joined.

---

**COUNSEL**

**ARGUED:** James A. Dunbar, VENABLE, BAETJER & HOWARD, L.L.P., Towson, Maryland, for Appellant. Robert Michael Jackson, HONIGMAN, MILLER, SCHWARTZ & COHN, L.L.P., Detroit, Michigan, for Appellees. **ON BRIEF:** Kathleen E. Wherthey, VENABLE, BAETJER & HOWARD, L.L.P., Rockville, Maryland, for Appellant. Robert J. Muchnick, HONIGMAN, MILLER, SCHWARTZ & COHN, L.L.P., Detroit, Michigan; Abbey G. Hairston, SEYFARTH SHAW, Baltimore, Maryland, for Appellees.

---

**OPINION**

LUTTIG, Circuit Judge:

W.B. Doner & Co. is an S corporation incorporated under the laws of Michigan. Donald Riesett, a citizen of Maryland, worked for Doner until February, 2000. While employed at Doner, Riesett held Doner stock, pursuant to a Shareholder Agreement, which provided:

> [u]pon the termination of a Shareholder's employment with the Company for any reason . . . Company will buy, and such shareholder . . . will sell, all of such Shareholder's Shares for the price established under Section 4.1 or .2 below, as applicable, with settlement to be made in accordance with Section 5 below.

J.A. 66. Doner did not redeem the stock after Riesett's termination of employment, and on June 30, 2000 Riesett filed a twelve-count complaint against Doner, under the diversity jurisdiction of 28 U.S.C. § 1332, alleging breach of contract and violations of state law. J.A. 11-79. On February 14, 2001 the parties entered into a Settlement Agreement that required Doner to pay Riesett several hundred thou-

sand dollars in damages (some of it payable immediately, the remainder payable in 120 monthly installments). J.A. 340-41. Doner also agreed to redeem Riesett's stock for $142,257.70 (subject to adjustments), most of it payable in four yearly installments, each due on May 31st. In the event of default by Doner, the Settlement Agreement provides:

> Riesett shall provide Doner with written notice of such untimely payment. If Doner fails to make any payment required under this Agreement with [sic] five (5) business days of receipt of notice from Riesett, then all further amounts due under this Agreement or those agreements shall become immediately due and payable.

J.A. 342. Doner further agreed to provide Riesett's accountant with information "reasonably necessary to form an opinion as to the proper valuation of Riesett's stock in Doner." J.A. 341.

Despite the settlement agreement, further litigation ensued. Riesett filed an amended complaint in the district court, post-settlement, with two new counts. Count XIII sought an order requiring Doner to produce certain documents that Riesett believed to be relevant to the valuation of Riesett's Doner stock. J.A. 194-95. In Count XIV, Riesett asserted his right, as a shareholder of Doner, to a distribution to defray taxes on his income, which the other shareholders of Doner received in January 2001. Finally, Riesett filed a motion to enforce the settlement agreement by accelerating all the stock redemption installment payments because the scheduled May 31, 2001 payment arrived late.

The district court granted summary judgment to Riesett on Count XIII, J.A. 437-41, but granted summary judgment to Doner on Count XIV, J.A. 441-45. Finally, the district court granted in part and denied in part Riesett's motion to enforce the settlement agreement. The district court refused to accelerate the remaining stock redemption installment payments, as Riesett requested, but instead ordered Doner to pay Riesett interest at the prime rate for the delay in the payment that should have arrived on May 31, 2001.

Because the district court entered a final judgment on all these claims pursuant to Fed. R. Civ. P. 54(b), we have jurisdiction over the parties' cross-appeals.

I.

We begin with Count XIV of Riesett's amended complaint, where Riesett seeks enforcement of his rights as a shareholder of Doner. Doner is an S corporation, and its shareholders receive distributions, at the beginning of each calendar year, to help them defray taxes on the income allocated to them by Doner and reflected on their K-1 statements. In January of 2001, Doner gave each of its shareholders a check for 43.5% of the income allocated on their form K-1 to defray tax liabilities.

Doner refused to give Riesett such a disbursement because Doner claimed he was no longer a shareholder. Riesett still received his form K-1 on March 2, 2001, which allocated nearly $800,000 in taxable income to Riesett for Doner's fiscal year ending on February 29, 2000, and faced a significant personal tax liability on that income, without receiving the customary distribution from Doner to defray this cost. Riesett claims he is still a Doner shareholder notwithstanding his termination of employment, and claims that Doner violated Mich. Comp. Laws Ann. § 450.1301(3)[1] by withholding the distribution and treating him differently than other shareholders in the same class.

The district court concluded that Riesett's shareholder status terminated when his employment ended in February, 2000, even though, by March 2, 2001, Riesett had not yet surrendered his stock certificates to Doner and had not received full payment for the stock. J.A. 444. The district court reasoned that "[t]he unconditional requirement that Riesett transfer his shares to Doner upon termination of his employment clearly indicates that the parties contemplated that Rie-

[1]"[E]ach share shall be equal to every other share of the same class." Mich. Comp. Laws Ann. § 450.1301(3). *See also Polish American Publishing Co.* v. *Wojcik*, 273 N.W. 771, 774 (Mich. 1937) ("All persons who own shares of stock in a corporation at the time a dividend is declared thereon are entitled to share in the dividend.").

sett would be a shareholder only while employed for the corporation."[2] J.A. 444.

We do not agree with the district court that Doner was entitled to summary judgment on the ground that Riesett was no longer a shareholder. The Shareholder agreement does not state that title to an employee's stock immediately passes to Doner upon that employee's termination; rather, it merely obligates the employee to sell and the company to buy all of the shares the employee owns at some point in time after termination of employment. The text of the Shareholder agreement bears repeating:

> [u]pon the termination of a Shareholder's employment with the Company for any reason . . . Company *will buy*, and such shareholder . . . *will sell*, all of such Shareholder's Shares for the price established under Section 4.1 or .2 below, as applicable, *with settlement to be made in accordance with Section 5 below*.

J.A. 66 (emphasis added). Section 5 provides when the "closing" or such a sale or purchase of stock would take place:

> The Closing Date will be . . . (b) if the purchase is made other than under clause (a) above, *the later of* (1) 90 days after the date of the event giving rise to the purchase of Shares from the Shareholder and (2) 30 days after the financial statements needed to determine the Book Value of such Shareholder's Shares have been completed.

J.A. 69. A reasonable jury could certainly conclude that, under the Shareholder Agreement, a terminated employee retains his rights as

---

[2]The district court further relied on *Jenkins* v. *Haworth, Inc.*, 572 F. Supp. 591, 601 (W.D. Mich. 1983) (holding that a terminated employee was no longer a shareholder, even though he had not yet surrendered his stock certificates nor received payment for them, because of a Buy/Sell agreement in the Shareholder contract similar to the one in this case). *Jenkins* is not mandatory authority. It is a federal district court opinion predicting what the Michigan state supreme court would do, not an authoritative interpretation from a state court.

a shareholder until "closing," and that Riesett therefore retained his rights as a shareholder after termination. Indeed, it is even possible, although we need not reach the issue, that the shareholder agreement unambiguously means that an employee does not automatically lose his shareholder status upon termination of employment. The agreement did not require Riesett to sell his stock immediately (and he did not), nor did it automatically strip Riesett of his status or rights as a shareholder upon termination. The agreement easily could have been drafted with provisions that would have eliminated any ambiguities and clearly stated that employees immediately lose their rights as shareholders upon termination of employment.[3] It was not so drafted, and the district court erred in granting summary judgment on this ground.

We nevertheless affirm the district court's grant of summary judgment to Doner on Count XIV because, regardless of whether Riesett remained a shareholder of Doner, he released this claim through the Settlement Agreement he signed on February 14, 2001. Riesett agreed to release Doner from:

> any claims for any other relief which have or could have arisen out of the employment relationship, *or any other occurrence whatsoever to the date of execution of the agreement*, whether presently asserted or otherwise, whether known or unknown, whether suspected or unsuspected.

J.A. 343 (emphasis added). Riesett's claim accrued in January of 2001, when the distribution to the shareholders occurred. *See* Mich. Comp. Laws Ann. § 600.5827 ("[a] claim accrues at the time the wrong upon which the claim is based was done regardless of the time when the damage results"). The settlement agreement was signed after that and therefore released Doner from liability for not making a distribution to Riesett. Riesett's argument that the claim accrued on

---

[3]We are not the first court to make this observation regarding buy-sell agreements in closely-held corporations. *See Stephenson* v. *Drever*, 947 P.2d 1301, 1305 ("[T]he parties have the power to agree that a shareholder loses his status as a shareholder upon some event other than actual transfer of shares to another.") (citing *Stephenson* v. *Drever*, 57 Cal. Rptr. 2d. 662, 664 (Cal. Ct. App. 1997)).

March 2, 2001 is without merit. Although Riesett received his form K-1 on that date, the allegedly wrongful distribution to Doner's shareholders, with Riesett excluded, occurred in January. Perhaps, Riesett learned of his claim on March 2, 2001, but the release covers claims "known or unknown" that existed on February 14. Accordingly, the district court's grant of summary judgment to Doner on Count XIV is affirmed.

## II.

We next address Count XIII. After the parties executed the Settlement Agreement, Riesett's accountant demanded the following documents from Doner: Doner's annual audited financial statements and federal tax returns, a complete analysis of stockholder equity transactions that occurred from March 1, 1981 through February 28, 2001, and any analysis of shareholder retained earnings for the period 1982 through 2001. Doner refused to turn them over, and Riesett sued. The district court granted Riesett's motion for summary judgment on Count XIII, concluding that Riesett's accountant was entitled to these documents pursuant to the Settlement Agreement, which provides:

> Riesett's accountant shall have the right to obtain from Doner's accountants *all information reasonably necessary to form an opinion as to the proper valuation of Riesett's stock in Doner. . . .* Upon receipt of the requested information, [Riesett's accountant] will have the right to obtain from Doner's accountants *additional information necessary and appropriate to form an opinion as to the proper valuation of Riesett's stock in Doner.*

J.A. 341 (emphasis added).

Doner deems this request unreasonable and unnecessary to calculate "book value" as defined in the Shareholder Agreement, and further contends that the only documents necessary to calculate the "book value" as defined in the Shareholder Agreement are the balance sheet and schedule of combined book value per share of common stock for the end of the fiscal year 1999. Doner's arguments are beside the point because they disregard the language of the Settlement Agreement. As the district court correctly observed, the Settlement

Agreement does not require that the information requested by Riesett's accountant be relevant to "book value" as defined in the Shareholder Agreement. J.A. 438. Rather, the only limitation on the information available to Riesett's accountant is that it be "reasonably necessary to form an opinion" as to the "*proper valuation*" of Riesett's stock. J.A. 341 (emphasis added). Nowhere does the Settlement Agreement define "proper valuation" as "book value" under the Shareholder Agreement; indeed, the Agreement does not provide any definition of "proper valuation." Because the parties used such an imprecise term, we conclude, as did the district court, that the Settlement Agreement entitles Riesett to make an independent assessment of the value of his stock, and that the requested documents are "reasonably necessary" to that end. The district court's grant of summary judgment to Riesett on this issue is affirmed.

## III.

Finally, we turn to Riesett's contention that the district court should have accelerated Doner's payments because of the late arrival of an installment due on May 31, 2001. The Settlement Agreement provides that, in the event of default by Doner,

> Riesett shall *provide Doner with written notice* of such untimely payment. If Doner fails to make any payment required under this Agreement with [sic] five (5) business days of receipt of notice from Riesett, then all further amounts due under this Agreement or those agreements shall become immediately due and payable.

J.A. 342 (emphasis added).

Doner had agreed to redeem Riesett's stock for $142,257.70 (subject to adjustments), with most of that sum payable in four yearly installments, each due on May 31. When Doner failed to make payment on May 31, 2001, Riesett sent a three-line notice of default addressed to H. Barry Levine (Vice Chairman of Doner) by certified mail. A return receipt shows an indecipherable signature (but not Levine's) and a date of delivery of June 1, 2001. J.A. 566. Doner claims that Levine "does not recall" receiving the letter of May 31, but that when Levine learned of the default on July 27, 2001, he

promptly cured the default by mailing a payment of $26,673.36 to Riesett on July 31, 2001. J.A. 566. (This was the amount due Riesett on May 31, but without interest for Doner's two-month delay.)

The district court found that even though Riesett complied with the notice requirement, it would be "unreasonable and unconscionable" to impose upon Doner the "harsh sanction" of accelerating the entire amount due Riesett for the redemption of his stock. J.A. 568. Instead, the district court ordered Doner to pay interest at the prime rate for the delay in payment from May 31, 2001 to August 2, 2001, when the check of $26,673.36 was received by Riesett. *Id.* We must address two issues: first, whether the conditions for enforcing the acceleration clause were satisfied, and second, if they were, whether we should nevertheless deny enforcement of that contractual provision.

A.

Under the Settlement Agreement, only two conditions must be met for Riesett to invoke the acceleration clause. First, Riesett must "provide Doner with written notice" of the untimely payment. Second, Doner must "fail[ ] to make" the delinquent payment "with [sic] five (5) business days of receipt of notice from Riesett." We find it difficult to credit Doner's argument that Riesett failed to "provide *Doner* with written notice," (emphasis added), as did the district court, which found Doner's arguments on this point to be "specious." J.A. 567. Someone at Doner signed the certified mail receipt, and although Riesett addressed the notice to Mr. Levine, nowhere does the Settlement Agreement require that Mr. Levine, or any specific officer at Doner, personally receive notice from Riesett. Nor does the Settlement Agreement require that notice be sent to Doner's counsel, as Doner appears to believe. *See* Appellant's Br. at 40. We conclude, as did the district court, that Riesett's notice, addressed to Mr. Levine and sent by certified mail, with the return receipt signed and received, sufficed to "provide Doner with written notice" of the late payment.

We are also satisfied that Doner "fail[ed] to make" the delinquent payment within "five (5) business days of receipt of notice from Riesett," as the certified mail receipt was signed on June 1, 2001 and Doner did not mail the payment to Riesett until July 31, 2001. Again, the acceleration clause hinges on whether *Doner* was provided with

notice, not whether Mr. Levine (or any particular officer at Doner) received notice. We know that *someone* at Doner received notice and signed the certified mail receipt. Perhaps this employee dropped the ball by failing to deliver the package to Mr. Levine, or perhaps Mr. Levine received the package but forgot about it — he did not deny receiving the certified mail sent by Riesett, but merely asserted that he "did not recall" receiving it. J.A. 447. Whatever the story, missteps by Doner personnel do not render Riesett's notice defective under the language of the Settlement Agreement. Riesett fulfilled his obligations to notify Doner, and Doner failed to make the late payment within the required five days.

B.

Notwithstanding Riesett's notice to Doner, the district court denied enforcement of the acceleration clause, in part because it believed that enforcement of the clause would be "unconscionable" given the circumstances of this case. To the extent the district court's opinion suggests or intimates that Doner could rely on the unconscionability doctrine to escape its contractual obligations under the Settlement Agreement, this was a mistake. When the substantive terms of a contract are so one-sided that a court is led to conclude that some defect in bargaining process (such as fraud, duress, or incompetence of a contracting party) led to the formation of the contract, then the unconscionability doctrine may be useful in helping courts ferret out such contracts, whose enforcement would neither promote the autonomy of the contracting parties nor enhance social welfare.[4] The unconscionability doctrine has no application to contracts, such as the Settlement Agreement in this case, which were entered into by sophisticated parties who bargained at arms' length and were represented by counsel throughout the negotiations. *See Stenke* v. *Masland Development Co., Inc.*, 394 N.W.2d 418, 424 (Mich. Ct. App. 1986) (refusing to find a

---

[4]*See*, *e.g.*, *Northwestern National Insurance Co.* v. *Donovan*, 916 F.2d 372, 377 (7th Cir. 1990) ("Perhaps the correct inference to be drawn from . . . cases that might be cited is that 'unconscionability' is little more than an umbrella term for fraud, duress, illegality, and violation of a fiduciary relationship.").

lease agreement unconscionable because it was "extensively negotiated by experienced and knowledgeable persons").[5]

Doner attempts to defend the district court's decision not to accelerate by claiming that it "substantially performed" its contractual obligations, because the payment arrived 61 days late and Levine "promptly corrected" the breach when it was brought to his attention. Doner misunderstands the doctrine of substantial performance. First, liability for breach of contract is strict, so Doner's contention that Levine "acted in good faith" by promptly sending payment to Riesett once the breach was brought to his attention is not sufficient to establish that Doner substantially performed its obligations under the settlement agreement. Notwithstanding the observation in *Jacob & Youngs, Inc.* v. *Kent*, 129 N.E. 889 (N.Y. 1921), that the contractor's failure to use the Reading pipe specified in the contract had been "unintentional," the court's finding of substantial performance in that case rested on the facts that the performance was "substantially" what the homeowner had bargained for *and* on Judge Cardozo's belief that the parties had not sufficiently stated in their contract that use of the

---

[5]Neither the parties nor the district court discussed the choice of law issue for interpretation of the settlement agreement. In the briefs, the parties seem to assume without explanation that Michigan contract law applies. As a federal court sitting in diversity, we must apply the choice of law rules of the forum state, *see Klaxon Co.* v. *Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941), in this case, Maryland. Absent a choice-of-law provision in the contract, Maryland applies the law of the jurisdiction where the contract was made to matters regarding the validity and interpretation of contract provisions, *see American Motorists Insurance Co.* v. *ARTRA Group, Inc.*, 659 A.2d 1295, 1301 (Md. 1995), and a contract is made where the last act necessary to make the contract binding occurs, *see Commercial Union Insurance Co.* v. *Porter Hayden Co.*, 698 A.2d 1167, 1200 (1997). *See also Continental Cablevision of New England, Inc.* v. *United Broadcasting Co.*, 873 F.2d 717, 720-21 (4th Cir. 1989) (explaining that, under Maryland choice of law rules, construction of settlement agreement is governed by the law of state to which agreement was mailed for execution by sole remaining party).

The settlement agreement was signed first by Donald Riesett on February 14, 2001, and last by Doner's representative in Michigan on February 19, 2001. The signatures by Doner's representative would be the "last act necessary" to make the settlement agreement binding.

Reading pipe was a condition precedent to receipt of payment. *See Jacob & Youngs*, 129 N.E. at 891 ("This is not to say that the parties are not free by apt and certain words to effectuate a purpose that performance of every term shall be a condition of recovery. . . . This is merely to say that the law will be slow to impute the purpose, in the silence of the parties, where the significance of the default is grievously out of proportion to the oppression of the forfeiture."). Although a breaching party's inadvertence may, in some cases, be relevant evidence as to whether the defect was "insubstantial," the doctrine of substantial performance ultimately turns on whether "all the essentials necessary to the full accomplishment of the purposes for which the thing contracted has been performed with such approximation that a party obtains substantially what is called for by the contract," *Gibson* v. *Group Insurance Co.*, 369 N.W.2d 484, 486 (Mich. Ct. App. 1985) (quoting 6A Michigan Law & Practice, Contracts, § 314, pp. 315-316), not on the breaching party's state of mind.

The second and more fundamental problem with Doner's argument is that parties cannot escape their contractually-chosen remedies for breach by invoking the doctrine of substantial performance. Although the doctrine of substantial performance prevents promisee opportunism by forbidding a promisee from walking away from a contract and refusing to perform his reciprocal contractual duties because of a minor breach by the promisor,[6] it does not mean that a promisor who "substantially performed" can avoid a lawsuit for damages by the promisee, or can escape the parties' chosen remedy for that shortcoming. *See* 3A Corbin, Contracts § 702 ("Substantial performance" is not a complete discharge of duty. It is not a defense in a suit . . . for damages."); *People* v. *Walton*, 440 N.W.2d 114, 116 (Mich. Ct. App. 1989) (holding that even where a party substantially performs its contractual obligations, "the other party may be entitled to 'extra compensation or damages' as a result of the deviation"). Even if we were to assume *arguendo* that Doner's late payment to Riesett constituted "substantial performance," it would not render inapplicable the acceleration clause. In *Jacob & Youngs*, notwithstanding the contractor's "substantial performance," the court *still* held that the homeowner was

---

[6]*See*, *e.g.*, *Antonoff* v. *Basso*, 78 N.W.2d 604, 610 (Mich. 1956) (if one party substantially performs, the other may not "*refuse to render a reciprocally promised performance*") (emphasis added).

entitled to expectation damages — the difference in the value of the house resulting from the use of non-Reading pipe. In this case, the district court (rather than enforcing the acceleration clause) ordered a make-whole remedy to put Riesett in the position he would have enjoyed had the late payment not occurred. This would have been an appropriate remedy *if* the parties had not agreed to a different remedy in the Settlement Agreement in the event of a late payment after notice. But Doner and Riesett bargained around the default rule of expectation damages and agreed that, in the event of a failure by Doner to make payment within five days of receipt of notice of default, all amounts not yet paid would become immediately due and payable.[7]

If courts were to substitute expectation damages for the parties' chosen remedy under an acceleration clause by talismanic invocation of "substantial performance," this would have serious ramifications for commercial lending. Acceleration clauses are essential in lending agreements because often, if a borrower makes late payments, litigation costs will dwarf any "expectation damages" (interest on late payments) that the lender might hope to recover in court. If lenders had to make do with expectation damages notwithstanding the existence of an acceleration clause in their agreements, borrowers would have every incentive to shirk and no incentive to pay on time, because borrowers would know that litigation over late payments would be une-

---

[7]*Jenkins* v. *USA Foods, Inc.*, 912 F. Supp. 969 (E.D. Mich. 1996), on which Doner heavily relies, is inapposite. In *Jenkins*, the plaintiff could not enforce the acceleration clause without violating his reciprocal contractual duty to "cooperate reasonably" with the defendants "to avoid the undue interruption of [the defendant's] operations and activities." 912 F. Supp. at 975. Therefore, because the defendants in *Jenkins* "substantially performed" their end of the bargain, the court refused to allow the plaintiff to disown his agreements and escape his contractual duties owed to the defendant by enforcing the acceleration clause.

In this case, by contrast, Riesett's enforcement of the acceleration clause would not violate any contractual duty owed to Doner under the settlement agreement. The "substantial performance" by a party only prevents the other party from repudiating his contractual promises, and Doner does not point to a single contractual obligation under the settlement agreement that Riesett has failed to perform or is trying to avoid.

conomical for the lender. We cannot accept Doner's argument that it can avoid the acceleration clause by relying on the doctrine of substantial performance.

### C.

Even though enforcement of the acceleration clause cannot be denied by relying on the doctrines of unconscionability or substantial performance, neither of the parties, nor the district court, discussed the Michigan law governing the validity and enforceability of acceleration clauses. Although acceleration clauses are valid and enforceable in Michigan, *see Washburn* v. *Michailoff*, 613 N.W.2d 405, 408 (Mich. Ct. App. 2000), a court may decline to enforce an acceleration clause where it would be "inequitable" to do so, *see State-William Partnership* v. *Gale*, 425 N.W.2d 756, 759 (Mich. Ct. App. 1988), or when "an honest dispute exists," *see Mitchell* v. *Dahlberg*, 547 N.W.2d 74, 78 (Mich. Ct. App. 1996). The district court did not apply Michigan law at all, and the factual record is insufficiently developed for us, as an appeals court, to determine as a matter of first impression whether enforcement of the acceleration agreement would be "inequitable" under Michigan law or whether "an honest dispute exists." These are fact-bound inquiries, and we will therefore remand this issue to allow the parties the opportunity to establish, before the district court, whether the acceleration clause is valid and enforceable under Michigan law.

### *CONCLUSION*

The district court's grants of summary judgment to Doner on Count XIV and to Riesett on Count XIII are affirmed. The district court's denial of Riesett's motion to enforce the settlement agreement is vacated and the case is remanded for further proceedings.

*SO ORDERED*