John S. DREWITZ, Appellant,

v.

MOTORWERKS, INC., et al., Respondents.

No. A04–2338.

Court of Appeals of Minnesota.

Dec. 13, 2005.

Paul W. Chamberlain, Chamberlain Law Firm, Wayzata, MN, for appellant.

William M. Hart, Mary M.L. O'Brien, Erica Gutmann Strohl, Meagher & Geer, P.L.L.P., Minneapolis, MN, for respondents.

Considered and decided by LANSING, Presiding Judge; KLAPHAKE, Judge; and MINGE, Judge.

## OPINION

LANSING, Judge.

John Drewitz, a minority shareholder-employee in Motorwerks, Inc., a closely held corporation, appeals from the dismissal of his complaint for breach of contract and for judicial intervention under Minn. Stat. § 302A.751 (2004), and from the denial of his motion to compel both a fair-value buyout and ongoing shareholder distributions. Drewitz argues that the district court erred by concluding that res judicata bars his claims, that he is no longer a shareholder, and that the only method to obtain relief is a motion to enforce the judgment in his previous action. We affirm in part, reverse in part, and remand for further proceedings.

## FACTS

Motorwerks, Inc., a closely held corporation, hired John Drewitz as a car salesman in 1990. In 1993 Motorwerks promoted Drewitz to general manager. After Drewitz's promotion, Drewitz and Motorwerks negotiated an employment and a shareholder agreement. Under the employment agreement, Motorwerks agreed to employ Drewitz as its vice-president and general manager from January 1, 1995, until March 31, 1999.

The shareholder agreement gave Drewitz the option to buy up to fifty percent of Motorwerks' shares and set forth the terms and procedure for the repurchase of Drewitz's shares. The agreement provided that, if Drewitz's employment was "terminated for any reason, whether voluntarily or involuntarily, the Company shall purchase, and the terminated Shareholder shall sell to the Company, all of the Shares of the Company issued to and outstanding in the name of the terminated Shareholder." The price for the redeemed stock was to be based on book value and would be determined as of the last day of the month immediately preceding the month in which the termination occurred. The agreement gave the parties up to ninety days from the employment-termination date or "[e]vent of [p]urchase" to finalize the buyout at a closing, at which time the parties must "pay in full all obligations."

### Employment Termination and Litigation

In December 1998 after receiving employee complaints about Drewitz's management, Motorwerks, relieved Drewitz of his general-manager duties but permitted him to receive his salary and incentive pay until the end of his employment term on March 31, 1999. In a letter to Drewitz in late December, Motorwerks explained the process for terminating and severing the employment relationship, including the purchasing of Drewitz's shares at book value.

In January 1999 Drewitz sued Motorwerks for a fair-value buyout of his shares under Minn.Stat. § 302A.751 (1998), claiming that he had been treated unfairly. Drewitz also asserted claims for breach of fiduciary duty, employment contract, and the covenant of good faith and fair dealing.

### Efforts to Tender Book Value

On July 1, 1999, Motorwerks sent Drewitz a letter formally demanding that he sell his shares back to Motorwerks at book value as required by the shareholder agreement. Motorwerks indicated its willingness to pay Drewitz the book value of

the shares calculated according to the formula specified in the shareholder agreement, and it proposed a closing date of July 16.

Drewitz refused the offer on July 8, claiming that, because he did not voluntarily terminate his employment, the shareholder agreement did not require him to sell his shares at book value. Drewitz also stated that, if the shareholder agreement did require him to sell his shares at book value, the requirement was unreasonable.

On July 26, notwithstanding Drewitz's refusal, Motorwerks sent Drewitz a check for $337,470 (the book value of the shares minus the amount Drewitz owed Motorwerks on a promissory note). Contrary to the express terms of the shareholder agreement, however, the amount tendered did not include interest, the check tendered was a business check rather than a certified or cashier's check, and the check contained language indicating that endorsement "constitute[d] full and final compensation" for the purchase of Drewitz's stock. Drewitz refused the tender, stating that he disagreed with Motorwerks' interpretation of the shareholder agreement. Drewitz also demanded shareholder distributions.

### Motorwerks' Summary–Judgment Motion

After Drewitz refused tender, Motorwerks moved for summary judgment. In December 1999 the district court granted Motorwerks' motion and dismissed all but one of Drewitz's claims, which the parties later settled.

Following the district court's grant of summary judgment, Motorwerks tendered book value for the redemption of Drewitz's shares along with a proposed settlement agreement. The settlement agreement provided for the redemption of Drewitz's shares, subject to his right to appeal the district court's decision on the share-valua-

tion issues. The amount tendered included interest calculated at a rate of five percent.

In July 2000 Drewitz requested changes to the settlement agreement, including a different interest rate, but did not recommend any changes to the share value. Motorwerks then provided him with a redlined version of the settlement agreement, but the applicable interest rate remained in dispute.

### Drewitz's First Appeal

While the parties continued to negotiate the interest rate, Drewitz appealed the district court's grant of summary judgment. In May 2001 this court affirmed, holding that the employment and shareholder agreements were valid and that the shareholder agreement required Drewitz to sell his shares to Motorwerks at book value. *Drewitz v. Walser*, No. C3–00–1759, 2001 WL 436223 at *5–*6 (Minn.App. May 1, 2001), *review denied* (Minn. June 27, 2001). We also held that, because no evidence shows that Motorwerks had acted in an unfairly prejudicial manner toward Drewitz or breached a fiduciary duty, Drewitz had not established circumstances triggering judicial intervention under Minn.Stat. § 302A.751. *Id.* at *5. The supreme court denied review.

### Postappeal Negotiations

After the supreme court denied review, the parties renewed their efforts to settle. Motorwerks and Drewitz initially agreed on a seven-percent interest rate that would accrue from the date of Drewitz's employment termination. In June 2002, however, Motorwerks sent Drewitz a letter, indicating that it had reconsidered the parties' tentative agreement and had decided that the interest period should run from July 2001 to June 2002, the period following the supreme court's order denying review; because the interest rates be-

tween July 2001 and May 2002 were lower than the interest rates between April 1999 and June 2001, the interest rate should be six percent rather than seven percent. Motorwerks also asked Drewitz to execute a signed release in connection with his receipt of any negotiated interest payment. Drewitz indicated his willingness to sign the proposed release but disagreed with the proposed computation of the interest payments. In January 2003 Drewitz sent Motorwerks a letter, indicating that he was willing to settle for $355,862 plus seven-percent interest, running from the date of termination of employment.

Although unable to resolve the interest issue, Motorwerks relied on the previous resolution of the book value of the shares, and, in August 2003, sent Drewitz a check for $355,862 as payment for his shares. The letter attached to the check indicated that Drewitz's cashing the check would not constitute a waiver of his right to claim interest on the payment. In a subsequent letter, Motorwerks offered to pay Drewitz twenty-five months of interest at a percentage equal to Motorwerks' percentage of earnings during the same period. This offer was conditioned on a settlement agreement containing a release of all claims.

### The Current Action

Despite repeated requests, Drewitz did not respond to Motorwerks' offer until May 25, 2004, when he returned the August 2003 check and brought this action for breach of contract, fiduciary duty, and the implied covenant of good faith and fair dealing and for judicial intervention under Minn.Stat. § 302A.751. Drewitz alleged that Motorwerks breached the shareholder agreement by failing to pay him distributions in proportion to his stock ownership while the buyout of his shares was pending. Drewitz also alleged that Motorwerks' failure to tender book value uncon-

ditionally within the time specified in the shareholder agreement triggered a fair-value buyout. Drewitz later moved to compel a fair-value buyout and the issuance of shareholder distributions.

The district court denied Drewitz's motion and dismissed the complaint, reasoning that the current claims for a fair-value buyout and for ongoing shareholder distributions were barred by res judicata; that Motorwerks did not owe Drewitz a fiduciary duty, because Drewitz's shareholder status terminated when his employment ended; and that a motion for enforcement of the original judgment was the proper procedure for asserting dissenters' rights under Minn.Stat. § 302A.473, subd. 7 (2004), and for determining the amount of interest, costs, and fees incurred in the present action. This appeal follows.

### ISSUES

I. Did the district court err by concluding that both Drewitz's current claim for a fair-value buyout and his breach-of-contract claim for ongoing shareholder distributions were barred by res judicata?

II. Did the district court err by concluding that Drewitz's shareholder status ended when his employment was terminated?

III. Did Drewitz's refusal of Motorwerks' initial tender excuse Motorwerks' obligation to tender and effectively extinguish Drewitz's shareholder status, notwithstanding Motorwerks' failure to tender book value unconditionally?

### ANALYSIS

### I

Drewitz challenges the district court's summary-judgment determination that his current claims were litigated in the original action and are, therefore, barred by

res judicata. We conclude that Drewitz's claim for a fair-value buyout is barred but his breach-of-contract claim for ongoing shareholder distributions is not.

■ Res judicata is a finality doctrine designed to ensure an end to litigation. *Hauschildt v. Beckingham*, 686 N.W.2d 829, 840 (Minn.2004). Under res judicata, a final judgment on the merits is an absolute bar to a second suit for the same cause of action and is conclusive, not only as to every matter actually litigated, but also as to every matter that might have been litigated. *Dorso Trailer Sales, Inc. v. Am. Body & Trailer, Inc.*, 482 N.W.2d 771, 774 (Minn.1992). Because res judicata precludes litigation of subsequent claims arising out of the same group of operative facts, whether or not a particular issue or legal theory was actually litigated in the original action, a party must "assert all alternative theories of recovery in the initial action." *Hauschildt*, 686 N.W.2d at 840. Whether res judicata precludes a claim is a question of law subject to de novo review. *Id.*

### Claim for a Fair–Value Buyout

■ Drewitz's current claim for a fair-value buyout arises out of the same set of factual circumstances and connected series of transactions as his original claim and is therefore barred by the judgment in the original action. The renewed claim of unfair treatment expands the original unfair-treatment claim to incorporate Motorwerks' failure to tender, but is essentially an extension of the same series of transactions that formed the basis for the original unfair-treatment claim that the district court decided against Drewitz on summary judgment. And the wrong for which Drewitz seeks redress—oppression or unfair treatment—is the same in both actions.

Drewitz initially sued Motorwerks in January 1999, claiming that Motorwerks had treated him unfairly and thereby triggered a right to a buyout of his shares at fair value under Minn.Stat. § 302A.751 (2004). Drewitz alleged that, contrary to his expectations, Motorwerks dismissed him from employment without warning or just cause, excluded him from the management and control of the corporation, prevented him from inspecting documents pertaining to Motorwerks' investigation into his job performance, and prevented him from exercising the balance of his stock options. The court granted summary judgment in Motorwerks' favor, dismissing all of Drewitz's claims except the breach-of-employment-contract claim, which the parties later settled. This court affirmed, and the supreme court denied review. *Drewitz v. Walser*, No. C3–00–1759, 2001 WL 436223 at *5 (Minn.App. May 1, 2001), *review denied* (Minn. June 27, 2001).

■ Drewitz filed his current action for a fair-value buyout in May 2004 on the alternative theory that Motorwerks triggered judicial intervention under Minn. Stat. § 302A.751 by failing to tender book value for his shares unconditionally before the redemption period expired. Drewitz is thus attempting to relitigate his original claim for a fair-value buyout under a failure-to-tender theory. Because this claim is an expansion of his original action and not a new cause of action, his current claim is barred. *See Hauschildt*, 686 N.W.2d at 840 (stating that parties are required to assert all alternative theories of recovery in initial action); *see also Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 97 (2d Cir. 1997) (stating that federal and state doctrines of res judicata preclude relitigation of claims that involve connected series of transactions present in original suit). Even if res judicata did not apply, Drewitz

initially indicated that he would not accept a book-value buyout and did not return to court to enforce a book-value buyout after the conclusion of the first appeal. His failure to pursue available remedies contravenes his claim that Motorwerks' continuing oppression should transform the book-value buyout into a fair-value buyout. *See Craigmile v. Sorenson*, 248 Minn. 286, 292, 80 N.W.2d 45, 49 (1956) ("It is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance ... of an obligation due him ..., he cannot take advantage of the failure." (quotation omitted)).

### *Shareholder–Distributions Claim*

Drewitz, in the current action, also alleges a breach-of-contract claim based on Motorwerks' failure to pay him the shareholder distributions provided in the shareholder agreement. The district court held that all claims were fully litigated in the original action, and Drewitz's claim was barred by res judicata. Drewitz argues that his breach-of-contract action was not litigated and could not have been asserted in the original action because the events underlying his claim for shareholder distributions had not occurred, and he could not have predicted when he brought that action that Motorwerks would fail to make shareholder distributions while the buyout was pending. Motorwerks counters that this claim was available to him while his original action was pending but was not asserted before entry of final judgment in that action. Motorwerks' argument thus implies a duty to seek leave to amend or supplement a pleading as new issues arise or risk claim preclusion.

Courts are divided on whether a party who fails to amend the complaint to include a claim that arose after filing is precluded from litigating the later claim in a subsequent suit. To determine whether the breach-of-contract claim is barred, we must determine whether Drewitz was obligated to seek leave to amend his complaint or file a supplemental pleading to preserve the claim, which arose after the filing of the initial complaint, but before the entry of final judgment.

Some courts have ruled that claim preclusion extends only to claims in existence when the original complaint was initiated, even if the new claims share the same nucleus of operative facts as the original claim. *See, e.g., Lundquist v. Rice Mem'l Hosp.*, 238 F.3d 975, 978 (8th Cir.2001) (stating failure to amend complaint to include claim not in existence at initiation of original action does not preclude claim); *Spiegel v. Cont'l Ill. Nat'l Bank*, 790 F.2d 638, 644–46 (7th Cir.1986) (concluding that res judicata does not bar claim that arises after commencement of initial action). According to this line of cases, the operative date for purposes of determining whether a claim was in existence is the date the original action was brought. *See, e.g., Apotex, Inc. v. Food & Drug Admin.*, 393 F.3d 210, 218 (D.C.Cir.2004) ("Res judicata does not bar parties from bringing claims based on material facts that were not in existence when they brought the original suit."); *Curtis v. Citibank*, 226 F.3d 133, 139 (2d Cir.2000) (stating that "[t]he crucial date [for res judicata purposes] is the date the complaint was filed" and that "plaintiff has no continuing obligation to file amendments to the complaint to stay abreast of subsequent events"); *Manning v. City of Auburn*, 953 F.2d 1355, 1360 (11th Cir.1992) ("We do not believe that the res judicata preclusion of claims that 'could have been brought' in earlier litigation includes claims which arise after the original pleading is filed in the earlier litigation." (quotation omitted)).

These courts based their determinations, in part, on the lack of a procedural obli-

gation to expand the scope of the first action to assert new claims. According to this line of reasoning, the *opportunity* to file a supplemental pleading to raise events occurring after an action is brought does not concomitantly impose an *obligation* enforceable by res judicata. *See, e.g., Baker Group, L.C. v. Burlington N. & Santa Fe Ry.*, 228 F.3d 883, 886 (8th Cir.2000) (stating that filing of supplemental complaint to raise events occurring after commencement of action is "permissive for the parties and discretionary for the court"); *Mitchell v. City of Moore*, 218 F.3d 1190, 1202 (10th Cir.2000) (stating that no obligation exists to expand action to add claim that party could not have asserted when action was commenced); *Pleming v. Universal–Rundle Corp.*, 142 F.3d 1354, 1356–59 (11th Cir.1998) (stating that plaintiff has opportunity, not obligation, to add later events to action by supplemental pleading); *Maharaj*, 128 F.3d at 97 ("If, after the first suit is underway, a defendant engages in actionable conduct, plaintiff may—but is not required to—file a supplemental pleading setting forth defendant's subsequent conduct. Plaintiff's failure to supplement the pleadings of his already commenced lawsuit will not result in a res judicata bar when he alleges defendant's later conduct as a cause of action in a second suit."). These courts have reasoned that this position "avoids the potentially unworkable requirement that every claim arising prior to entry of a final decree must be brought into the pending litigation or lost." *Manning*, 953 F.2d at 1360 (quotation omitted).

By contrast, the Ninth Circuit Court of Appeals requires parties to seek leave to amend a pleading to add newly arising claims involving the "same harms and primary injury" or risk claim preclusion. The Ninth Circuit cases have concluded that, when claims involve "the same harms and primary rights," "the doctrine of res judicata bars the relitigation of all events which occurred prior to entry of judgment, and not just those acts that happened before the complaint was filed." *Monterey Plaza Hotel Ltd. P'ship v. Local 483 of the Hotel Employees & Rest. Employees Union*, 215 F.3d 923, 927–28 (9th Cir.2000). Under this approach, a claim is considered the same cause of action as the initial claim and is precluded when both actions grow out of the same transaction or nucleus of facts, would entail the presentation of the same evidence, and would involve infringement of the same right. *Feminist Women's Health Ctr. v. Codispoti*, 63 F.3d 863, 867–68 (9th Cir.1995). Thus, under the Ninth Circuit's view, if evidence to support the claim arises before entry of judgment in the first case, claims relying on that evidence must be brought in the first action or not at all.

█ Drewitz's breach-of-contract claim for shareholder distributions indisputably shares some of the same operative facts as the original claim because it arises, in part, out of the termination of his employment and Motorwerks' failure to tender book value plus interest for his shares. But the injury for his breach-of-contract claim, unlike the injury for his unfair-treatment claim, did not occur before the commencement of the initial action, and the claim therefore did not accrue until Drewitz was excluded from shareholder distributions made after his employment ended and *after* his original action had been brought.

For two reasons, we conclude that Drewitz was not required to amend his complaint to prevent claim preclusion. First, rule 15.04 of the Minnesota Rules of Civil Procedure makes the filing of supplemental pleadings permissive rather than mandatory. *See* Minn. R. Civ. P. 15.04 (stating that court *may permit* party to serve supplemental pleading setting forth

transaction that occurred after original pleading was filed); *see also Baker Group,* 228 F.3d at 886 (relying on rule 15(d) of Federal Rules of Civil Procedure and a corresponding state rule, both of which make filing of supplemental pleadings permissive, in holding that res judicata extends only to claims in existence when original action was brought). The failure to supplement a pleading does not therefore preclude a second action based on conduct that occurred after the original action was brought. Because rule 15.04, like its federal counterpart, does not obligate a party to expand the scope of its first action to assert new claims, the failure to supplement a pleading does not preclude a second cause of action based on conduct that occurred after the original action was brought. *See* Fed.R.Civ.P. 15(d) (providing that district court *may permit* plaintiff to supplement its complaint to assert cause of action arising after original complaint was filed). We therefore agree with the reasoning of the circuit courts that have concluded that filing a supplemental pleading is an opportunity rather than an obligation with res judicata implications.

Second, we agree with the view that "[s]ubstantial disruption could result from forced amendment at any time after significant discovery has been accomplished, and [that] it is hard to justify any test relating to the progress of discovery or other pretrial events so clear that plaintiffs could afford to apply it without seeking explicit judicial guidance." 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4409 (2nd ed. 2002). We conclude that the "better rule," therefore, is that "a claim for damages need include only matters arising out of injuries inflicted before the action is filed." *Id.*

Accordingly, because Drewitz's breach-of-contract claim arose out of events and injuries that occurred after his first action was filed and he had no obligation to amend his complaint to include breach of contract, we hold that Drewitz's claim for distributions is not barred by res judicata.

In so holding, we note that Drewitz's counsel admitted at oral argument that Drewitz is not entitled to recover both shareholder distributions and the full value of his shares including interest. *See, e.g., Shriner v. Sheehan,* 773 N.E.2d 833, 844 (Ind.App.2002) (holding that award to minority shareholder of both full value of his shares and posttermination distributions would produce a double recovery for minority shareholder). We also note that, in this appeal, Drewitz has not raised any shareholder governance issues for the period during which he is claiming shareholder distributions. We therefore do not reach any shareholder governance issues. *Cf.* Minn.Stat. § 302A.011, subd. 41(1) (2004) (limiting beneficial or equitable ownership of shares subject to tender to those accepted for purchase); *Miller Waste Mills, Inc. v. Mackay,* 520 N.W.2d 490, 494 (Minn.App.1994) (holding that shares cannot be voted contrary to interests of corporation that has become equitable owner of stock through exercise of stock-redemption provision).

## II

Having concluded that Drewitz's claim for ongoing shareholder distributions is not barred, we next consider whether the district court erred by dismissing Drewitz's breach-of-contract claim and by denying Drewitz's motion to compel ongoing shareholder distributions until the completion of the buyout.

■ The district court held that Drewitz was not entitled to shareholder distributions because he was no longer a shareholder and his rights were limited to enforcement of the original judgment.

But the judgment in the original action had no effect on Drewitz's shareholder status; it established only that Motorwerks had a right to buy Drewitz's shares at book value. Although either party could have requested relief to fix a definitive date or establish the exact amount for the mandatory buyout, neither did. Therefore, Drewitz's shareholder status is contingent on whether, by the terms of the shareholder agreement, he was automatically divested of his shareholder rights when his employment ended, notwithstanding Motorwerks' failure to tender full and unconditional payment for his shares. Neither Drewitz nor Motorwerks asserts that the shareholder agreement is ambiguous. We therefore review the effect of the agreement as a question of law. *See Yang v. Voyagaire Houseboats, Inc.*, 701 N.W.2d 783, 788–89 (Minn.2005) (stating that effect of unambiguous contract is question of law).

Two lines of authority address whether a minority shareholder who has consented to a mandatory buy-sell agreement remains a shareholder after the termination of employment. Under the first line of authority, an employee who is subject to a mandatory buyout is divested of shareholder status immediately upon the termination of employment, even if the corporation has not yet redeemed the employee's stock, the value of the stock has not yet been determined, and the employee has not yet surrendered his stock certificates to the corporation. *See Jenkins v. Haworth, Inc.*, 572 F.Supp. 591, 601–02 (W.D.Mich.1983) (holding that corporation did not owe minority shareholder, who consented to mandatory repurchase of his shares upon termination from employment, fiduciary duty to act for valid business reason); *Gallagher v. Lambert*, 74 N.Y.2d 562, 549 N.Y.S.2d 945, 947, 549 N.E.2d 136 (1989) (holding that corporation did not breach fiduciary duty by prematurely terminating rights of minority shareholder who consented to mandatory buy-sell agreement and that shareholder lacked standing to assert derivative action because his shareholder status ended upon termination from employment).

· Courts following this line of authority have reasoned that the unconditional requirement that an employee transfer his or her shares to the corporation at the termination of employment indicates that the parties contemplated that the employee would be a shareholder only while employed by the corporation. *Id.* According to these courts, the implied intent to terminate shareholder status upon termination from employment serves the valid business purpose of allowing the corporation to be controlled by its employees and avoids the possibility of interference with management by a former employee bearing a grudge against his or her former employer. *See, e.g., id.* at 946, 549 N.E.2d 136 (noting that buy-sell agreements "are designed to ensure that ownership of all of the stock, especially of a close corporation, stays within the *control of the* remaining corporate owners-employees"); *see also Coleman v. Taub*, 638 F.2d 628, 637 (3d Cir.1981) (stating that existence of buy-sell agreement creates reasonable inference that corporation intended "to avoid under all circumstances the risk of disruption from a dissident, disaffected ex-employee" and that employee "bargained for the right to be a shareholder only while he remained an employee").

Under the second line of authority, an employee's shareholder status ends when his or her employment is terminated only if the buy-sell agreement expressly provides that title to an employee's stock passes to the corporation automatically upon termination of employment, rather than merely obligating employee to sell

and corporation to buy employee's shares sometime after termination of employment. *See Riesett v. W.B. Doner & Co.*, 293 F.3d 164, 169–70 (4th Cir.2002) (noting that employee retains shareholder status until closing when his or her shares are sold to corporation); *Stephenson v. Drever*, 16 Cal.4th 1167, 69 Cal.Rptr.2d 764, 947 P.2d 1301, 1305 (1997) (rejecting claim that agreement, which does not expressly require employee immediately sell his shares after termination, does not result in loss of shareholder rights). In *Stephenson*, the court held that an employee was not divested of his shareholder status when his employment was terminated, reasoning that the buy-sell agreement did not expressly provide that the employee's shareholder status lapsed when his employment ended. *Stephenson*, 69 Cal.Rptr.2d 764, 947 P.2d at 1305. For four reasons, the court rejected the corporation's claim that the buy-sell agreement implied on its face the parties' intention to terminate the employee's shareholder status automatically upon the termination of employment. *Id.*

First, the court reasoned that the claimed implication of intent was inconsistent with the express provisions of the buy-sell agreement, which gave the corporation the right and obligation to repurchase the employee's shares. *Id.*

Second, the court observed that the process specified in the buy-sell agreement for the valuation of the shares contemplated some delay in finalizing the repurchase of the employee's shares after termination and therefore "tend[ed] to negate any inference that the parties intended that the repurchase of the shares be consummated—and a fortiori that [the former employee's] status as a shareholder be terminated—immediately upon [the former employee's] termination." *Id.* at 1305–06.

Third, the court concluded that an implied intent would have the effect of stripping the employee of his right to dividends and to participate in the corporation's governance even though the employee remained the legal and record owner of shares. *Id.* at 1307. The court stated that "[a] shareholder without a shareholder's rights is at best an anomaly" and declined to "interpret the contract to produce this result without a compelling reason to draw the inference proposed by [the corporation]." *Id.*

Finally, the court reasoned that the termination of shareholder status before valuation of the shares and tender of the purchase price would have the effect of relieving the corporation of its fiduciary duties to a terminated minority shareholder employee, even though the former employee remained the owner of the minority shares while the parties attempted to determine the fair value of the shares. *Id.* at 1308. The corporation could thus use its power during this time to control corporate activities in a manner detrimental to minority shareholders. *Id.* According to the *Stephenson* court, the implied contractual provision was inconsistent with the strong public interest of ensuring that corporations faithfully comply with their fiduciary obligation to minority shareholders. *Id.*

Relying in part on the reasoning of the *Stephenson* court, we conclude that the mandatory buy-sell agreement did not automatically divest Drewitz of his shareholder status when his employment was terminated. First, although the plain language of the agreement obligates Drewitz to sell his shares back to Motorwerks upon termination of employment, it does not expressly strip Drewitz of shareholder status at termination or provide that title to Drewitz's shares passes to Motorwerks automatically or immediately upon termi-

nation. Instead, the agreement provides that ownership of the shares would transfer at a formal closing and gives the parties up to ninety days after termination of employment to consummate the transfer. It does not, therefore, evidence an intent to divest Drewitz of his shareholder status immediately upon termination of employment. Motorwerks' argument to the contrary is inconsistent with the transfer-of-shares process specified in the buy-sell agreement, which specifically contemplates a ninety-day delay in consummating the sale. Had the parties intended to terminate Drewitz's shareholder status immediately upon termination of employment, they could have included a provision to that effect in the buy-sell agreement, just as they included a provision unambiguously establishing that Drewitz's right to buy any further Motorwerks shares lapsed in the event he was terminated from employment. *See Riesett*, 293 F.3d at 170 (rejecting district court's determination that buy-sell agreement implied intent to terminate shareholder status upon termination of employment, reasoning that mandatory buy-sell agreement "could have been drafted with provisions that would have eliminated any ambiguities and clearly stated that employees immediately lose their rights as shareholders upon termination of employment"). Under the agreement as drafted, Drewitz retained his shareholder status until the date of closing.

Second, as the *Stephenson* court noted, an implied provision that the parties intended to terminate shareholder status at the termination of employment, irrespective of tender, would unfairly strip a minority shareholder of all shareholder rights while he remains the legal owner of the shares, would allow the corporation to benefit unfairly from the shareholder's investment, and would relieve the corporation of its fiduciary duties in a manner inconsistent with sound public policy.

Finally, the Third Circuit Court of Appeals specifically rejected the automatic-divestiture line of authority that originated in *Jenkins*, reasoning that "*Jenkins* is not mandatory authority [but] a federal district court opinion predicting what the Michigan state supreme court would do." *Id.* In a recent nonprecedential case, the Michigan Court of Appeals also rejected the reasoning in *Jenkins* and held that a buy-sell agreement, which specified that ownership of shares would transfer at a formal closing held within nine months of the shareholder's exercise of an option to sell, did not "evidence an intent to divest the [shareholder's] legal or equitable ownership of the shares at the time they merely notify the [buyers] of their decision to exercise the option [to sell]." *Allen v. Plummer*, No. 224500, 2002 WL 652129 at *4 (Mich.Ct.App. Apr. 19, 2002).

Buy-sell agreements are executory contracts to buy and sell personal property and are subject to the rules governing the validity, interpretation, and enforcement of contracts. *Stephenson*, 69 Cal.Rptr.2d 764, 947 P.2d at 1304. Because the buy-sell agreement in this case did not expressly provide that Drewitz's shareholder status ended immediately when his employment was terminated, but instead provided for full payment for his shares at closing and contemplated a ninety-day delay in consummating the transfer of shares, Drewitz remained a shareholder until Motorwerks tendered full payment for his shares unconditionally. The district court therefore erred by denying Drewitz's motion to compel shareholder distributions and dismissing his breach-of-contract action on the ground that he ceased being a shareholder when his employment ended. A holding to the contrary would make the provisions for the transfer of shares at closing unnecessary.

## III

We now turn to Motorwerks' claim that Drewitz's initial refusal to accept book value for his shares, demonstrated by his original action seeking a fair-value buyout, excused Motorwerks' obligation to tender book value as a condition precedent to terminating Drewitz's shareholder status. Stated differently, we consider whether Motorwerks' obligation to tender book value to terminate Drewitz's shareholder status was excused because any attempt to tender book value would have been futile.

■ We conclude that although Motorwerks' obligation to tender book value within ninety days was excused by Drewitz's suing for a fair-value buyout, Drewitz's implicit refusal to accept tender of book value did not terminate his shareholder status—it only preserved Motorwerks' contractual right to compel Drewitz to sell his shares back to the corporation at book value after expiration of the ninety days.

■ A tender is "[a] valid and sufficient offer of performance; [specifically] an unconditional offer of money or performance to satisfy a debt or obligation." *Black's Law Dictionary* 1507 (8th ed. 2004). To be valid, the offer to pay must be unconditional. *Moore v. Norman,* 52 Minn. 83, 86, 53 N.W. 809, 810 (1892) ("The debtor has no right to the benefit of a tender, as having the effect of a payment, when it is burdened with such condition that the creditor cannot accept the money without compromising his legal right to recover the further sum which he claims to be due."); *Balder v. Haley,* 441 N.W.2d 539, 542 (Minn.App.1989) (stating that tender "is not effectual if it [is] coupled with such conditions that the acceptance of it, as tendered, will involve an admission by the party accepting it that no more is due" (quotation omitted)), *review denied* (Minn. July 27, 1989).

The district court found that Motorwerks tendered a check for $355,862, the agreed-upon book value of Drewitz's shares. But Drewitz correctly argues that because the tender did not include interest and was conditioned on the execution of a settlement agreement not contemplated by the buy-sell agreement, it was ineffectual.

The record shows that Motorwerks first tendered payment for Drewitz's shares in July 1999. But the tender was for the wrong amount, the check tendered was a business check rather than a certified or cashier's check as specified in the buy-sell agreement, and the check indicated that endorsement constituted full payment for Drewitz's 495 shares.

In July 2000 Motorwerks tendered the wrong amount once again, along with a settlement agreement that the shareholder agreement did not contemplate. A tender that is conditioned on the full discharge of the debtor's obligation is invalid, unless the parties agree otherwise. *See Balder,* 441 N.W.2d at 542 (requiring tender be unconditional and not compromise legal right to receive more). The parties did not agree otherwise.

In June 2002 Motorwerks tendered payment, but again conditioned it on a general release that required Drewitz to waive his claimed right to two years' worth of interest. Finally, in August 2003, Motorwerks tendered the correct principal amount unconditionally but did not tender the correct interest.

Motorwerks argues that it met its contractual obligation by "offering to tender book value in December 1998 and by remaining willing and able to do so throughout the 90–day redemption period." But a mere *offer* to provide tender, without the actual attempt to deliver the money, does not constitute a proper tender of the money. *Metro. Credit Union v. Matthes,* 46

Mass.App.Ct. 326, 706 N.E.2d 296, 302 (1999) (stating that valid tender requires actual production and delivery of money); *Diamond v. Sandpoint Title Ins., Inc.*, 132 Idaho 145, 968 P.2d 240, 244–45 (1998) (stating that valid tender requires debtor to produce money physically).

Motorwerks also argues that because Drewitz clearly indicated by his actions that any attempt to tender would have been unacceptable, Drewitz's commencement of his original action for a fair-value buyout excused Motorwerks from its obligation to tender book value within the redemption period. Drewitz indeed waived the formalities of a tender within the ninety-day redemption period. But the waiver did not transfer ownership of the shares or eliminate Drewitz's shareholder status.

 Under Minnesota law, one is not obligated to do "the useless and futile thing" in complying with the formalities of a tender. *Wangensteen v. N. Pac. Ry.*, 218 Minn. 318, 324, 16 N.W.2d 50, 53 (1944). Thus, tender need not be made when the failure to tender is justified or when the tender would be an "idle ceremony." *Country Club Oil Co. v. Lee*, 239 Minn. 148, 155, 58 N.W.2d 247, 251 (1953) (holding that plaintiff's failure to make tender of price specified in option contract was excused by defendant's repudiation of contract and refusal to go through with transaction because tender would have been futile and useless); *Morgan v. Ibberson*, 215 Minn. 293, 295, 10 N.W.2d 222, 223 (1943) ("A tender is waived when the tenderee assumes any position which would render it, so long as such position is maintained, a vain and idle ceremony.").

 By filing his original action for a fair-value buyout, Drewitz implicitly rejected Motorwerks' December 1998 offer to repurchase his shares at book value and thereby arguably waived Motorwerks' obligation to tender book value *within the time specified in the shareholder agreement.* But the waiver of the *formalities of the tender* did not result in the de facto repurchase of the shares, which would terminate Drewitz's shareholder status. When a right is entirely contingent on the tender of a required performance, the refusal to accept tender does not divest the parties of their interest in the property at stake or revest in the parties title to the property. *Dunn v. Hunt,* 63 Minn. 484, 486, 65 N.W. 948, 949 (1896) (holding that mere refusal to accept plaintiff's tender at foreclosure sale did not divest defendant, holder of certificate of redemption, of his interest in premises or revest clear title in plaintiff).

 Because Motorwerks' right to redeem Drewitz's shares was entirely contingent on the tender of the book value of Drewitz's shares, Drewitz's refusal of Motorwerks' nonconforming tenders did not divest him of his shares or revest title of the shares in Motorwerks. The refusal of tender excused the formalities associated with the performance of Motorwerks' contractual obligation, precluded Drewitz from asserting the unfinished formalities as a defense after obtaining an adverse result, and preserved Motorwerks' contractual rights despite its failure to timely perform. *See Wangensteen,* 218 Minn. at 324–25, 16 N.W.2d at 53 (holding that plaintiffs who refused $125 tender in settlement of an action, stating that they would not accept less than $250, waived the formality of any further tender for costs and disbursements by insisting upon the sum of $250 as a minimum settlement). But it did not terminate his shareholder status. Under the terms of the shareholder agreement, the termination of Drewitz's shareholder status is contingent on an event that has not yet occurred—Motor-

werks' unconditional tender to Drewitz of book value plus interest for his shares.

## DECISION

We affirm the district court's summary-judgment determination that res judicata barred Drewitz's claim for a fair-value buyout, but we reverse the district court's summary-judgment dismissal of Drewitz's claim for breach of contract and its determination that res judicata and lack of shareholder status barred Drewitz's motion for ongoing shareholder distributions.

**Affirmed in part, reversed in part, and remanded.**

KLAPHAKE, Judge (concurring in part, dissenting in part).

Although I concur with the majority that appellant's claim for fair-market valuation of his shares is barred by res judicata, I respectfully dissent from the majority's conclusion that appellant remains a shareholder with the respondent corporation and is entitled to shareholder distributions awarded since termination of his employment.

The majority correctly identifies two competing lines of authority on this issue. Under the first line of authority, the majority notes:

> [A]n employee who is subject to a mandatory buyout is divested of shareholder status immediately upon the termination of employment, even if the corporation has not yet redeemed the employee's stock, the value of the stock has not yet been determined, and the employee has not yet surrendered his stock certificates to the corporation [citing *Jenkins v. Haworth, Inc.*, 572 F.Supp. 591, 601–02 (W.D.Mich.1983); *Gallagher v. Lambert*, 74 N.Y.2d 562, 549 N.Y.S.2d 945, 947, 549 N.E.2d 136 (1989)].

Under the second line of authority, the employee's shareholder status ends after termination only if the buyout agreement expressly provides for transfer of title on termination of employment. *See, e.g., Stephenson v. Drever*, 16 Cal.4th 1167, 69 Cal.Rptr.2d 764, 947 P.2d 1301, 1305 (1997). Although this is not a settled area of law in Minnesota, the majority chooses to adopt this second line of authority in deciding that appellant remains a shareholder entitled to distribution rights.

The reason for following the first line of authority is compelling, particularly when a closely-held corporation is involved: such buyout agreements permit a corporation to be controlled by its employees and preclude interference by a disgruntled former employee. In contrast, the *Stephenson* court argued that a corporation's obligation to repurchase the shares implies that the employee continues as a shareholder until the sale is concluded, and that without an express provision terminating the employee's right as a shareholder, there is no indication in the buyout agreement that such a consequence would flow from termination of employment. *Stephenson*, 69 Cal.Rptr.2d 764, 947 P.2d. at 1305–06.

Here, a close reading of the employment and shareholder agreements negates this type of reasoning. Appellant's purchase and continued ownership of the shares is conditioned on employment. Upon termination of employment, whether voluntary or involuntary, the corporation was required to purchase and appellant was required to sell the shares. The mechanism for determining the purchase price and the date for closing is clearly delineated. The agreement distinguishes between the date of purchase and the date of closing: the date of termination is referred to as an "Event of Purchase;" the date of closing, presumably the point at which payment is

to be tendered, is 90 days after the "Event of Purchase." This suggests that "purchase," or the transfer of shares, occurred on the date of termination.

Although no Minnesota cases deal directly with the rights of a terminated shareholder/employee in the interim between termination and final payment, this court has previously determined that equitable ownership in a stock can occur, although legal title has not yet passed. In *Miller Waste Mills, Inc. v. Mackay*, 520 N.W.2d 490, 494 (Minn.App.1994), *review denied* (Minn. Oct. 14, 1994), a family corporation invoked a provision that required corporate consent for transfer of shares and a first right of repurchase. The heirs of two deceased shareholders contended that as representatives of the estates they had the right to vote what would be a majority of shares because legal title of the stock had not been transferred. *Id.* at 495. This court concluded that the corporation, by virtue of the stock redemption provision, became the equitable owner of the deceased shareholders' stock. *Id.* Our decision relied on the existence of a contractual obligation created by the stock redemption among the shareholders. *Id.*

We have a similar situation here: a contractual agreement between shareholders that recognizes a right to own shares based on employment, a right that ceases to exist on termination of that employment. The corporation here became the equitable owner of the shares and appellant retained the right to payment for the shares as outlined in the employment and shareholder agreements, but not a continuing right to shareholder distributions.

Respondents have undoubtedly breached the agreement governing termination of appellant's status as employee and shareholder, by failing to tender payment in a timely fashion in accordance with the agreement. But there is a remedy for this failure: interest will continue to accrue under the agreement until respondents properly tender payment.